438 P.2d 760

STATE of Arizona ex rel. Justin HERMAN, Director, Arizona Highway Department, Appellant and Cross-Appellee,

v.

Jack A. WILSON and Violet R. Wilson, his wife, Appellees and Cross-Appellants.

STATE of Arizona ex rel. Justin HERMAN, Director, Arizona Highway Department, Appellant and Cross-Appellee,

v.

James L. FINLEY and Margaret I. Finley, his wife, Appellees and Cross-Appellants.

No. 8930–PR.

Supreme Court of Arizona.

In Banc.

March 13, 1968.

Darrell F. Smith, Atty. Gen., William E. Kimble, Special Asst. Atty. Gen., Tucson, for appellant and cross-appellee.

Dunseath, Stubbs & Burch, Tucson, for appellees and cross-appellants.

STRUCKMEYER, Justice.

This appeal arises out of two actions in eminent domain brought by the State of Arizona and consolidated for trial. Judgments for the condemnees, the Wilsons and the Finleys, were entered in the superior court, appealed by the State and cross-appealed by both the Wilsons and Finleys. The Court of Appeals set aside the judgments and remanded the causes for new trial, 4 Ariz.App. 420, 420 P.2d 992, on rehearing 4 Ariz.App. 577, 422 P.2d 408. Opinions of the Court of Appeals vacated.

The condemnations grew out of the conversion of State Route #86 into U. S. Interstate #10 between Willcox and Benson, Arizona. Prior to the taking of the property, Highway #86 was a four-lane divided highway with direct access permitted from the abutting property on both sides. The Wilson and the Finley properties fronted on the southeast edge of the northeast-bound lanes, and frontage was taken from both properties in order to construct an interchange at a point known as Dragoon Road. After the interchange was completed, the right-of-way was fenced off so entrance could be had only at the interchange by means of Dragoon Road.

The Wilson property consists of approximately 185 acres located in Texas Canyon, an area of unusual rock formations considered to be extremely scenic. On it, the Wilsons operated the Triangle T Motel and Guest Ranch. In 1956, Highway #86 ran

through the property, 25 acres being to the north of the roadway and 160 acres to the south. There were about 2,000 feet of frontage with direct access from both sides of the highway. At about midpoint a ten-by-ten cement culvert passed under the highway through which motor vehicles could be driven, so that there was access to both parts of the Triangle T Ranch. The highway is somewhat higher than the 160 acres on the south, hence travelers can look directly down Texas Canyon upon the guest ranch and, since the access to the property was approximately in the middle of the frontage, the entrance was visible for 300 feet in either direction. Travelers desiring to avail themselves of the guest ranch facilities had ample opportunity to slow down and turn off onto the Triangle T access road.

After Highway #86 was fenced because of its conversion to a limited-access highway, Interstate #10, visitors no longer had direct access to the ranch but had to use the Dragoon Road Interchange, between 800 or 900 feet west of appellees' property. A traveler going east must take a ramp road 1500 feet west of the interchange, leave the ramp at Dragoon Road, turn south and go about three-quarters of a mile, then turn off Dragoon Road and turn onto the Wilson property, the building still being approximately 2,000 feet away. A westbound traveler must go past the Wilson property, turn onto the interchange approximately 500 feet beyond the overpass of Dragoon Road and Interstate #10, turn back to Dragoon Road, pass under Interstate #10 and then go to the Wilson property on Dragoon Road in the same manner as the traveler coming from the west.

At the trial there was testimony from expert witnesses for appellees that the highest and best use of the property was for resort and recreational purposes. There was also testimony that the market value of the property was substantially reduced by the loss of direct access to the highway. Over the State's objection, a witness testified that approximately 4,000 vehicles traveled the highway during the course of a 24-hour period. The court instructed the jury:

"In valuing the property of the defendants before the condemnation, you may consider evidence concerning the amount of traffic which passed along the highway in the vicinity of defendants' property."

There was testimony from Mrs. Wilson that after the loss of direct access to the highway the gross volume of business "suffered one-third drop." " * * * It was disastrous. Probably two a year come in where many did before."

■ The State argues first that the testimony concerning the amount of traffic and the decline in business was improperly submitted to the jury for the reason that access rights are personal to the owners of the abutting property with no access right in the general public. If by this is meant that there is a compensable damage only for the individual owner's personal loss of use, such an abnormal limitation is rejected forthwith. Access may be defined as the right vested in the owner of land which adjoins a road or other highway to go and return from his own land to the road or highway without obstruction. Stoner Manufacturing Corp. v. Young Men's Christian Assoc'n. of Aurora, 13 Ill.2d 162, 148 N.E.2d 441. Such a right, to be of any substantial utility, must necessarily include the owner's invitees and licensees.

"The * * * right of access would seem to include the opportunity for a man's customers to come to his place of business without unreasonable hindrance or interruption." Reining v. New York L. W. Ry. Co., 13 N.Y.S. 238, 240.

It would be an insubstantial right, indeed, were this Court to hold that the owner's family, servants, friends and guests are unable to pass to and from the property at his invitation.

■ The State complains that the court permitted the jury to consider evidence concerning the amount of traffic which

passed along the highway in the vicinity of defendants' property within a 24-hour period. While it is to be acknowledged that an abutting owner does not have the right to insist that traffic pass over the highway in front of his property undiverted and unobstructed, Rayburn v. State ex rel. Willey, 93 Ariz. 54, 378 P.2d 496, this does not mean that if traffic is using the highway an abutting property owner may not profit from its flow. And if travelers who were formerly attracted to the Triangle T Ranch do not now find their way onto the property because of the lack of direct access, manifestly it is the destruction of the access which has reduced the business profits and, therefore, the valuation as a commercial property. That property has intrinsic value arising out of its uniqueness cannot be doubted. The Triangle T is unique because of a scenic location with its ready accessibility to traffic flow. So, while the State is under no duty or obligation to send traffic past appellees' property, as long as the traffic does pass, the appellees are entitled to avail themselves of it in common with other abutting owners. The trial court did not err in permitting the jury to consider the amount of traffic flow as support for the expert appraisers' opinions that the value of the property was diminished through loss of accessibility to such flow.

■■ The appellant complains that the court erred in permitting the jury to consider loss of business as an item of damage. While we have said that evidence of business earnings is ordinarily improper in condemnation actions, City of Phoenix v. Consolidated Water Co., 101 Ariz. 43, 415 P.2d 866, it is not every loss of business which is impermissible, Maricopa County v. Shell Oil Co., 84 Ariz. 325, 327 P.2d 1005. Irrespective, we do not understand that Mrs. Wilson's testimony was offered to prove the amount of appellees' damages but to establish that appellees were damaged. Her testimony established that the access rights were valuable and led to the inference that there was a diminution in the highest and best use of the property occasioned by the impairment of access. From such a loss the jury could conclude that the expert's opinion of a reduction in the market value was reasonably supported by facts. In passing, it is to be noted that the trial court correctly instructed the jury that it was not to consider any claim of loss or impairment of business "inasmuch as the law permits damages to be awarded for injury to property but not injury to business conducted thereon."

The State argues that access to existing highways may be regulated under the police power of the state where reasonably designed to promote the public safety and welfare. We recognize that there are a number of states which, in recent years, have adopted the principle that the right of direct access to a public highway may be limited to frontage roads and possibly to other circumstances in which access is not unreasonably circuitous. See e. g., Ray v. State Highway Comm., 196 Kan. 13, 410 P.2d 278; cert. denied 385 U.S. 820, 87 S.Ct. 43, 17 L.Ed.2d 57, 43 A.L.R.2d 1072; Houghs v. Mackie, 1 Mich.App. 554, 137 N.W.2d 289; Moses v. State Highway Commission, 261 N.C. 316, 134 S.E.2d 664; State Highway Commission v. Central Paving Co., 240 Or. 71, 399 P.2d 1019; Stefan Auto Body v. State Highway Commission, 21 Wis.2d 363, 124 N.W.2d 319; and Covey, Frontage Roads: To Compensate or not to Compensate, 56 Nw.U.L.Rev. 587.

■ But we do not have such a situation here for there is no frontage road and the substitute access road is, in our opinion, unreasonably circuitous. Accordingly we hold, consistent with our former decisions, that the complete destruction of direct access to a public highway constitutes a damaging of property within the meaning of the Constitution of Arizona. Art. II, § 17 A.R.S. See Pima County v. Bilby, 87 Ariz. 366, 351 P.2d 647.

In 1956, the State Highway Department purchased an easement from the Wilsons

for the purpose of making Highway #86 a divided highway. The easement provided:

"CONSIDERATION:

"In consideration of the premises, covenants, and conditions to be kept and performed by the Grantee and the further consideration of the sum of TWO HUNDRED SIX AND 50/100 Dollars ($206.50) the Grantor does hereby grant a perpetual easement, * * *."

After construction of the divided highway, a crossover was built by the highway department, joining the northbound lane to the southbound lane of traffic, thereby permitting vehicles traveling in either direction to turn into appellees' property.

■ The trial court permitted Mrs. Wilson to testify that the consideration for the easement included, in addition to the recited consideration, an oral promise to build the crossover. The State complains of the admission of the testimony concerning the crossover as violating the parol evidence rule. We do not think so. We have repeatedly held that the parol evidence rule does not prevent evidence of the true consideration for a deed. State ex rel. Herman v. Tucson Title Insurance Co., 101 Ariz. 415, 420 P.2d 286, and cases cited. In this jurisdiction, not only is parol evidence admissible to show the true consideration for a deed when the proof is not in conflict with recitals but it is admissible even where the evidence is in conflict with the recited consideration. Longanbill v. Zook, 38 Ariz. 540, 3 P.2d 273.

The State urges that the language of the deed granting to the State of Arizona a right-of-way for the highway included the direct access rights. The granting clause of the instrument provided a perpetual easement and a waiver of "all claim for damages or compensation for and on account of the establishment and construction of said highway." The instrument further provided that the consideration was "full compensation for the land taken as right-of-way and in settlement for all claims for damage and for injury or damage to the contiguous land from which the right-of-way is severed."

■ We find nothing in the language of this instrument which gives rise to the feeling that there was an intention to convey to the State the Wilsons' direct rights of ingress and egress to the highway. The waiver of a claim for damages for construction of the highway has no relation to loss of access through the building of a fence parallel to the highway. If a legal right was intended to be purchased, it should be established by the use of plainer language than this. Moreover, the instrument seems to expressly recognize the Wilsons' right of direct access to the highway. By paragraph three of the "conditions" thereof, it was provided:

"A new paved turnout or entrance shall be constructed at approximate Highway Engineer's Station 724+00 * * *."

A new turnout or entrance was constructed at Station 724+00 which was used for ingress and egress until the highway was fenced. The language quoted and the subsequent construction of the turnout or entrance to the Wilson property is wholly inconsistent with the claim that the instrument was intended to operate as a conveyance of the right of access.

The State complains that the trial court permitted the Wilsons to show that a certain motel chain made an inquiry concerning the Triangle T property. No attempt was made to establish that any offer to purchase had been received as a result of such inquiry. Presumably the evidence was offered to prove that the property was suitable for use as motel-guest ranch property. We think that it is unnecessary to enter into a discussion of the merits of the State's complaint, believing that the testimony was of such insignificance in this lengthy trial that even if it was improperly admitted it would have had little influence on the ultimate verdict of the jury.

The State assigns two reasons for reversal of the Finley judgment. The Finleys owned 4.87 acres at the southwest corner

of the intersection of Highway #86 and Dragoon Road. On the Finleys' land a service station had been operated in years past. For the construction of the interchange, the State took over half of the Finley property. Included was the portion which the buildings occupied.

The State complains of the admission into evidence at the trial of Defendants' Exhibit H, being a résumé of a log of the operating hours and gallonage of a pump on a well supplying the Finleys with water. This log is a résumé of water pumped by the Isbell Construction Company, highway contractors, from January 18 through February 22, 1957. It purports to show that in a period of 35 days 369,000 gallons of water were pumped. The matter of capacity of the water supply was injected into the trial through the testimony of Mrs. Ruth J. Oaks, the appellees' expert appraiser.

"Q And Mrs. Oaks, in making your appraisal of the Finley property did you make any assumption concerning the capacity which the Finley well had, in other words, how many gallons it could pump a day?

"A Yes, I did.

"Q And what type of assumption did you make that the Finley well could pump? How many gallons a day was it capable of pumping?

"A It was capable of pumping at least 60 gallons per minute or 3600 gallons per hour, or multiplied by the number of hours in a day.

"Q Is this an assumption, Mrs. Oaks, based upon any information which you had available to you before making your appraisal?

"A Yes, it was.

"Q What information is it based on?

"A It is based on the information from the Isbell Construction Company that they—

"[Counsel for the State]: Excuse me. That answers the question."

When Mrs. Oaks was later again interrogated concerning the water supply, the State objected, saying:

"If your Honor please, if this [testimony concerning the well's capacity] is offered for hearsay purposes in establishing the reliability of water supply, I object to it on that basis. If it's not, but only to form a basis of the witness' opinion, I request that the Court so instruct the jury.

"[Counsel for Appellees]: Yes, your Honor, it is offered to show the basis of this witness' opinion. It is for that purpose being offered."

The trial judge then instructed the jury pursuant to the State's request. Later, Exhibit H was received in evidence over the State's objection.

The State disclaims any error in the fact that the witness was permitted to rely on hearsay as the basis for her opinion. It does urge that the effect of the admission of the log into evidence was to change it in the minds of the jury from evidence of the basis of the expert's opinion to either proof of the facts stated in it or to bolster the expert's opinion with written corroboration of the expert's testimony.

■ While, undoubtedly, the asserted résumé of the log of the water pumped by the Isbell Construction Company in January and February, 1957, was erroneously admitted in evidence, we think that its purpose as a basis for the witness' opinion was made abundantly clear to the jury from the quoted testimony. The instruction requested by counsel and given by the court emphasized that the evidence of the well's capacity was solely to establish a basis for an opinion. Under these circumstances, we find it difficult to believe that the jury was misled to the State's prejudice by the introduction into evidence of Exhibit H.

Finally, the State urges that the testimony of the expert witnesses concerning the value of the Finley property was based on the existence of an adequate water supply

for commercial purposes; whereas, in fact, the water supply was only for domestic purposes. The Finley water was obtained from a well on property owned by Lloyd C. Adams and his wife. The Adamses had formerly granted "an easement for the construction, operation and maintenance of a domestic well and pipe line * * *."

The State argues that the word "domestic" has the meaning of "pertaining to the household or family; relating to one's home or home life * * *." Webster's International Dictionary (2d Ed.1943). But we think that the adjective "domestic" in the phrase "domestic well" need not necessarily be so limited; that it may have been used in a special sense, as is sometimes used in this jurisdiction to mean a well of a capacity suitable for domestic purposes; that, consequently, the word "domestic" is not necessarily a limitation on the purpose of the use but a limitation on the quantity of the use.

■ We note that by § 45–301, subsecs. 3, 8 and 14, of the *Ground Water Code*, 15 A.R.S., Title 45, a distinction is statutorily recognized between domestic wells and irrigation wells, irrigation wells being described as those having a capacity in excess of 100 gallons per minute. In any event, lacking direct testimony of the meaning which the parties attached to the use of the phrase "domestic well" and in the light of the continued use of the water for the service station, an obviously commercial purpose, we cannot say that the expert witness' conclusion as to the extent of the supply is either more or less likely to be correct than the State's.

■ The appellees have filed a cross-appeal in this Court. They seek, in part, by their cross-appeal to have answered certain legal questions which were decided in the court below adversely to them. They do not seek a reversal of the judgment. This Court does not sit to determine questions in the abstract. Appeal may be taken only from those adverse judgments and orders recognized by statute, A.R.S. § 12–2101.

■ In part the cross-appeal is an argument that the verdicts in the trial court were inadequate and that they should be modified upward by this Court. Appellees did not request relief in the trial court on the grounds that the verdicts were inadequate pursuant to Rule 59(i)2, Rules of Civil Procedure, 16 A.R.S. We do not deem that a request for enhanced damages is now proper in this Court without an appropriate request for relief from the trial court.

Judgment of the Pima County Superior Court is affirmed.

UDALL, V. C. J., and BERNSTEIN and LOCKWOOD, JJ., concur.

McFARLAND, Chief Justice (dissenting).

I am unable to agree with the views expressed by the majority opinion in this case.

I feel that now is the time, and this is the case, to reconsider our past decisions on the question of compensation for impaired access, when applied to the new type of high-speed limited-access highways now being built. The old rules are simply not suitable for these super-highways, and the trend of the more recent cases is to so hold. Thus, in Moses v. State Highway Commission, 261 N.C. 316, 134 S.E.2d 664, we find:

"Ancient doctrines pertaining to roads of the horse and buggy days, when these roads were for the most part trails through the woods and fields, must be applied to modern conditions with caution and sound discrimination. Once 'ingress and egress' were practically all such a road afforded, and there is logic in the thought that it is all of such a doctrine which should survive * * * The trend of judicial decision * * * is decidedly toward confining such a right to the necessity of ingress and egress.

"* * * [A]bsolute equality of convenience cannot be achieved, and those who * * * purchase and occupy

property in proximity to public roads or streets do so with notice that they may be changed as demanded by the public interest. * * * It is not enough that the vacation results merely in some inconvenience to his access, or compels a more circuitous route of access, or a diversion of traffic from the premises, or a consequent diminution in value. * * * An inconvenience of that nature is held to be no different in kind, but merely in degree, from that sustained by the general public, and is damnum absque injuria.

"Our trunk line highways are built and maintained to meet public necessity and convenience in travel, and not for the enhancement of property of occasional landowners along the route."

In Arkansas State Highway Commission v. Bingham, 231 Ark. 934, 333 S.W.2d 728, 732, the court said:

"As the problem of regulating motor vehicle traffic on the highways has become more and more complex, new standards of design for highway construction have been adopted * * * to reduce the hazards of travel and expedite the flow of traffic. * * * Such rules and regulations have been recognized by all of the authorities as a valid exercise of the police power."

As stated by Justice Holmes in Pennsylvania Coal Company v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322:

"Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized some values are enjoyed under an implied limitation and must yield to the police power."

I believe that the whole subject should be re-examined in the light of the trend of the cases in other states and the decisions of our own Court. We have set forth rules in a line of cases in regard to this subject, including State ex rel. Morrison v. Thelberg, 87 Ariz. 318, 350 P.2d 988. I think the majority fails to apply and interpret those rules properly, as far as they prescribe the measure of damages for destroying or impairing an abutting owner's access rights.

The gravamen of Wilson's complaint is that motorists no longer come directly from the highway to rent rooms at his guest ranch. He attributes this situation to the fact that the highway is fenced along his property line, and by the time the motorists see the beauty of the area, they have already passed the first interchange, and the second interchange is not seen until after they have passed the property. In my opinion it does not follow that the limitation of access is the cause of Wilson's decreased revenue, for several reasons: (1) His access to the highway was extremely limited in the before situation, by the natural topography which made it impossible for prospective guests to enter his property from the highway, except at two or three points; (2) The mere fact that the highway was widened, the surface improved, and the speed limit increased, could account for the fact that motorists' high speeds were the reason for Wilson's property being by-passed; and (3) There was no showing that other motels in the area had not increased in number, or stepped up their advertising or offered better accommodations than Wilson's.

There is no proof in the record that the motel operation was profitable. So far as we know, it may have been operating at a loss, in which event the whole theory of the case—that the highest and best use was for a motel—is untenable.

But, conceding for the purpose of the argument that the State's construction impaired the access of these two condemnees, and that this gave rise to the necessity of compensating them, still the majority opinion fails to recognize that the measure of damages approved in Thelberg, supra, was misapplied and misinterpreted by the trial court in the instant case.

In State ex rel. Sullivan v. Carrow, 57 Ariz. 434, 440, 114 P.2d 896, 898, we held that:

"* * * Yet we conclude that appellant seeks compensation for the loss of something he never had, something in which he had no claim of property right or ownership at any time; that something being the right and privilege, as against the state or any one else, to perpetuate the highway along and in front of appellant's lands. This is his sole loss, and we conclude it to be noncompensable in damages. * * *

"* * * [T]he loss occasioned by the fact that traffic no longer stopped as it had, and thus defendants' improvements were of no further value, cannot be considered as an element."

This rule applies whether traffic has been diverted by changing the highway's grade (Thelberg, supra), by changing its location (Carrow, supra), or by erecting a divider along the median (Rayburn v. State ex rel. Willey, 93 Ariz. 54, 378 P.2d 496). *Depreciation in value of property, caused by loss of traffic, is damnum absque injuria.* The same is true of loss of business profits caused by decreased traffic. State v. McDonald, 88 Ariz. 1, 352 P.2d 343.

In Thelberg, supra, we said:

"The measure of damages for the destruction or impairment of access * * * is the difference between the market value of the abutting property immediately before and immediately after the destruction or impairment thereof. * * * Other means of access * * * may be taken into consideration."

It is clear to me that Thelberg, supra, in prescribing the difference between the before and after values as the measure of damages for impairing access, did not intend to change the rules previously established and to include elements of damage not otherwise compensable.

The problem is stated in 56 Northwestern Univ.Law Rev. 587, at page 604:

"Since the before-valuation will reflect the value added because of the proximity of heavy traffic, and the after-valuation will reflect the decline because of its absence, this rule compensates the owner for the diversion of traffic, even though compensation would be denied if the highway had been completely relocated a mile or two away."

E. Coleman Gorman, in 3 Ariz.Law Rev. 48, writes as follows:

"The court [in Thelberg] confined its deliberations to access rights, since *there was no question of traffic flow loss before it for consideration.* Nevertheless, in reality, traffic flow loss was comingled with access loss in the finding of fact in the trial court. Had the lower court found separate items of damages, as suggested under A.R.S. 12–1122B showing what part of this $10, 750.000 was for access loss and what part for traffic flow loss, the finding would have disclosed that the lion's share was for the loss of the flow of traffic * * * the diversion of which lowered its highest and best use from commercial to residential property, resulting in a reduction of value not so much for access loss as for diversion of traffic." [Italics ours.]

In Thelberg, the trial court found that the taking included some of the improvements, and that, after the taking, the highest and best use went from commercial to residential, so the real question of traffic flow was not clearly presented on appeal.

In Rose v. State of California, 19 Cal.2d 713, 123 P.2d 505, 520, in a 20-page opinion, the Supreme Court of California stated:

"It was contended on behalf of the landowner that because * * * he was entitled to recover for that injury, the damages to his remaining land should be based upon the total depreciation in the value of his remaining property even though that depreciation was caused primarily by an admittedly noncompensable element of damage, that is, diversion of traffic. * * * While diminution in market value [is] ordinarily the test of

damage to real property, *the damages must be limited to those which accrue by reason of the legal injury for which compensation [is] due."* [Italics supplied.]

In City of Chicago v. Spoor, 190 Ill. 340, 60 N.E. 540, the Supreme Court of Illinois said:

"This being a suit where access to the property was affected, the [trial] court seems to have held that everything resulting from the improvement which affected unfavorably the utility of the property for business purposes was an element of damage * * *. The evidence of damages resulting from diversion of traffic or changing the method of transportation on the street, was not legitimate for any purpose, and opinions of witnesses based on depreciation from those causes should have been excluded."

Gorman, in 3 Ariz.Law Rev. 48, 53, says: "The 'before and after' formula in the Thelberg case makes sense if we give the proper weight to non-compensable items * * * *by deducting from the gross diminution of market value due to all damages, that portion attributable to non-compensable items* such as loss of the king's traffic." [Italics supplied.]

In Blumenstein v. City of Long Beach, 143 Cal.App.2d 264, 299 P.2d 347, the court stated:

"* * * [A]lthough diminution of market value of the subject property caused by the construction of the complained-of improvement is in general a proper measure of damages in condemnation actions, direct or inverse, *the decline in market value must be tempered by an exclusion of loss of value due to non-compensable injury.* Appellate decisions of this state have made it clear that damages resulting from mere diversion of traffic or inconvenience resulting from circuitry of travel in reaching the subject property are noncompensable." [Italics ours.]

In Sacramento and San Joachim Drainage District ex rel. Reclamation Board v. Reed, 215 Cal.App.2d 60, 29 Cal.Rptr. 847, 850, the court said:

"Where cross-examination reveals that loss-of-value testimony was based on noncompensable items, the testimony will be stricken in response to a proper motion."

It is contended that even though it is admitted that the diversion of the traffic flow is a noncompensable item, nevertheless the impairment of the owner's access in the instant case has reduced the highest and best use of the land from commercial to residential. The real question involved, however, is whether—even though this contention is true—the decrease in best use is due to impairment of access, which is compensable, or is due to decreased traffic flow, which is not.

"* * * [A] loss occasioned by the diversion of traffic is not compensable. It is not denied in this case that the lessee's major loss of business was the result diversion of through traffic * *. The right here claimed by lessee is not to be confused with its right of ingress and egress. The latter right * * * is a property right which is compensable." Ark. State Highway Commission v. Bingham, 231 Ark. 934, 333 S.W.2d 728.

Thus, it is clear that the rule announced by Thelberg was intended to mean, and should be construed to mean, that the measure of damages, where access is taken or impaired, *is that part of the difference in the before and after market values of the remaining property, which is due to the taking of, or injury to the right of access, not including any damages caused by non-compensable factors.*

So much for the principal issue of this case. There are a number of collateral issues on which I also disagree with the majority—namely, certain rulings on the admissibility of evidence. However, in the interests of brevity I will not discuss them. Suffice it to say that, in my opinion, some of the evidence admitted was clearly improper.

For the reasons set out above, this case should be reversed and remanded.