**Jose Ortega CABRERA et al.,**
**Plaintiffs,**

v.

**MUNICIPALITY OF BAYAMON et al.,**
**Defendants.**

**Civ. No. 126–72.**

United States District Court,
D. Puerto Rico.

Jan. 30, 1974.

Arturo Aponte-Pares, Olaguibeet Lopez-Pacheco, San Juan, P. R., for plaintiffs.

Jose Manuel Ramos, Esq., Mark C. Jimenez, Ines Acevedo .De Campos, San Juan ,P. R., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CANCIO, Chief Judge.

The present action was filed by verified complaint by José Ortega Cabrera and others representing a class of citizens residents of the Municipality of Bayamón, Buena Vista and Ortiz Wards, against Guillermo Campos, Mayor of Bayamón, in his personal and official capacity as Mayor of the Municipality of Bayamón, and Mr. Salvador Díaz Collazo, in his personal and official capacity as head of the Municipal Dump Operation System.

Jurisdiction was based on the Civil Rights Act, 42 U.S.C.A. § 1981 et seq., 28 U.S.C.A. §§ 1343, 2201 and 28 U.S.C.A. § 1331. Additional allegations were filed by plaintiff averring the existence of a conspiracy under 42 U.S.C.A. §§ 1983 and 1985 between defendant Guillermo Campos and other Commonwealth officials. Plaintiffs voluntarily dismissed this additional jurisdictional ground but without withdrawing its factual allegations to that effect.

An order to show cause was issued by the Court. Defendants moved to dismiss

the complaint on several grounds, which were denied in open court.[1]

Evidentiary hearings were held on February 18 and 22; March 16, 20, 21, 23 and 28; April 3, 4, 5 and 10; June 5, 6, 7, 8, 9, 12, 15, 26, 27, 28 and 29, and August 10, 1972, in which both parties presented voluminous oral and documentary evidence.

Two ocular inspections of the Municipality Dump Area at Bayamón were conducted by the Court and the observations of the Court were made part of the record.

The order of evidence was altered by consent of the parties and the approval of the Court, due to the fact that many of the witnesses were public employees and professors at the University of Puerto Rico who were not available at the most convenient moment.

At the request of plaintiffs and with consent of the defendants, the Court allowed the Geological Services of Puerto Rico, Inc., and the Puerto Rico Soil Testing Laboratories, Inc., to conduct a series of drillings in the Municipal Dump area. Also with the consent of plaintiffs and at the request of defendants, the Court allowed the Public Works Department of the Commonwealth of Puerto Rico to conduct a similar set of drillings in the same area. With the consent of both parties, biological, chemical, and physical tests were made of different samples of water from the dump area and the wells of neighbors whose properties lie adjoining the area. The U.S. Geological Survey Team of the Department of the Interior of the United States graciously made extensive chemical, physical and biological tests of the water in the Municipal Dump Area and adjoining areas including the wells of neighbors.

The parties stipulated that the preliminary injunction and permanent injunction would be submitted by the evidence presented in the hearings. The issue of damages would be left for further hearings, if needed.[2]

From the oral testimony of all witnesses, from the appreciation of all physical evidence, as well as the Court's own appreciation in the ocular inspections of the area, and given the weight of all evidence, the Court arrives at the following,

## CONCLUSIONS OF FACT

1. Plaintiffs are members of a group of families living in the Municipality of Bayamón, Buena Vista and Ortiz Wards, a rural area in the nearby mountains of Bayamón. They are located about 12 kilometers from the urban center of Bayamón and at a medium elevation of 150 meters above sea level.

2. The region is characterized by high relief hills and mountains and slopes and V shaped canyons. The abundant rainfall, averaging 75 inches per year, allows for agricultural activities all year around.

3. The area where the dump is located is situated physically in the uppermost part of a ravine. Plaintiff Feliciano Baez' farm has one of its boundaries adjacent to the dump area.[3]

4. A careful evaluation of all expert testimony and evidence submitted by both parties indicates that a zone of high permeability prevails regionally in the sub-surface rock at the dump site. It contains all the important characteristic factors necessary to absorb, retain, and transmit ground water through its entire fractured system and to discharge through springs and to transmit water to the permanent water table.

---

1. By memorandum and order of April 4, 1972, the Court explicitly disposed of defendants' motion to dismiss.

2. In regard to the jurisdictional requirement of damages in excess of $10,000 for 28 U.S. C.A. § 1331, the Court concludes that damages claimed clearly exceed that amount.

3. Feliciano Baez owns a farm of 11 "cuerdas", José Ortega Cabrera one of 7 "cuerdas" and Félix Díaz one of 3 "cuerdas". There are approximately 15 houses in these three farms.

5. Investigations at the dump site and along adjacent properties by different witnesses and by the Court indicate that a continuous "spring-line does exist along a trend parallel to the bottom of the V-shaped valley occupied by the existing creek and starting above the dump site. There is a series of springs in the dump site area." [4]

6. On ocular inspection, the Court observed a constant discharge of water into the creek coming from underneath the disposal mass of garbage and fill material, even after a drought lapse of several days. This water had a noticeable strong foul odor and was visibly turbid.

7. Along the creek there are five wells or springs, to wit: (1) Feliciano Baez' spring, located approximately 150 feet below the dump and 4 feet from the creek; (2) José Ortega's spring, 350 feet below the dump and 8 feet from the creek; (3) Félix Díaz' spring, 550 feet below the dump and 75 feet from the creek; (4) Juan Cintrón's spring, 700 feet below the dump and 52 feet from the creek; (5) Hogar Crea's spring, 800 feet below the dump and 18 feet from the creek.[5] The line of springs is interconnected underground.

8. The creek that is born in the hills and crosses the largest property is a tributary to Río La Plata, one of the largest rivers in the island.

9. During the last few years the Municipality of Bayamón has been in need of obtaining a site to build a new dump area. Several feasibility studies were made of the different areas in which to locate the new dump. The site selected was the present one. At the time of selection of this area, Engineer Mario Medero Rivera, who was working for the Municipal authorities, objected verbally and in writing to the construction of the new dump site because water pollution problems were foreseen. Guillermo Campos, then Mayor of Bayamón, had knowledge of that objection.

10. One of the reasons for objection to the site of the new dump was the fact that in the designated area there was a creek that started at a higher point in the hills and ran towards River La Plata across Road 167. There were also several wells and springs in the area.[6]

11. Plaintiffs and the neighbors of the area had been using the creek water and the wells for over 50 years for drinking, fishing, swimming, bathing, picnics and outings, and as source of aesthetic beauty and recreation. Different species of fish and shrimp were found in the creek and were used as a source of fishing for recreation.

12. Plaintiffs and other neighbors used the same water to bathe and for all purposes in their houses. During the last 20 years electric pumps were installed to pump water directly to their homes from the different wells along the edges of the creek. Mr. José Ortega Cabrera had the water of his spring tested by a laboratory and the water was found safe to drink.

13. As soon as knowledge of the plans to open a new dump in this area

4. Exhibit 17 and 18-a. Notes and reports made by Engineer Francisco A. Vargas Corales. Memorandum on Report of Case No. 72–110 of Board of Appeals, Board of Appeals on Constructions and Lotifications, page 6, last paragraph. "The farm for this addition contains a spring where a current of water is born that continues in a creek. Along this creek there exist five (5) other springs that are deemed for domestic use of the water in the abodes of several families."

5. For identification purposes, the Court designates each spring with the name of the owner of the property where it is located.

Other families besides those of the land owners used the water from these springs.

6. Engineer Mario Medero Rivera is very familiar with the topography of the general area where the new dump was located because, for several years, in his professional capacity he has done engineering work for the residents of the area. See Plaintiffs' Exhibit 9, Map of the area drawn by him in 1962, for submission to the Planning Board of Puerto Rico for the approval of a segregation of a lot of land clearly showing the creek flowing downhill from the area where the new dump is located at present.

reached plaintiffs and other citizens in the neighborhood, they started opposition to the opening of the new dump area because of the probability of water pollution. On May 11, 1969 a series of letters and correspondence between plaintiffs and Mayor Guillermo Campos started, plaintiffs expressing objections to the establishment of the new dump. The letters were answered by defendant and his employees, as well as by different agencies of the Commonwealth of Puerto Rico, assuring plaintiffs that no action would be taken without timely notice to them and the opportunity to be heard in the matter.

14. On November 12, 1969 the Planning Board of the Commonwealth of Puerto Rico favorably recommended the preliminary plans for the acquisition of the land for the proposed dump site of Bayamón, but expressly indicated that this action was not an approval of the development plans nor of the construction of the dump area.[7] Under Planning Board Regulation No. 2, Article 5, Guillermo Campos, in his official capacity as Mayor of Bayamón, was the person responsible for the preparation and submission of the project of the proposed Bayamón dump site.

15. Several times during the year 1970, meetings between Guillermo Campos and plaintiffs were held. At these meetings, plaintiffs and other residents of the area insisted in their opposition to the dump because of the danger of water pollution and other environmental hazards, but they were reassured by defendant every time that all precautions would be taken to prevent such occurrence.

16. Under the Municipal Law of Puerto Rico, the Mayor must propose to the Municipal Council the annual budget for the fiscal year.[8] Guillermo Campos complied with this requirement and, with the Municipal Council, approved the different budgets everytime. The sums for the condemnation and development of the dump site were included in the budgets approved, and later supplemented by the Municipal Council with the Mayor's approval.[9] None of the plaintiffs were notified as to the place and time of the hearings required for the approval of the different parts of the budget,[10] thus depriving them of an opportunity to raise their opposition to the establishment of the new dump site.

17. The Environmental Quality Board informed the Governor, on July 15, 1971, that they had no objection to the construction of the Municipal Dump Yard.

18. The Commonwealth of Puerto Rico, for the benefit of the Municipality of Bayamón, condemned in Civil suit 71–764, filed on August 31, 1971 at the Superior Court, Condemnation Part, San Juan, Puerto Rico, the tract of land where the new Municipal Dump Yard was going to be located.[11] None of plaintiffs nor their neighbors were notified of the suit. Plaintiffs had no knowledge whatsoever of the pendency of the suit, nor were they given any opportunity to oppose or contest it.

19. Although the practice is to hold public hearings in such cases, in this specific instance none was held. No environmental impact statement was filed by the Municipality of Bayamón as required by law,[12] prior to the establish-

---

7. See Plaintiffs' Exhibit No. 11, p. 4, 2d paragraph: "Provided, besides, that this favorable recommendation does not imply the approval of the development plans of the lands, nor of the construction, which should be submitted to the consideration of this Planning Board opportunely in accordance with the Laws, Regulation and Planning Norms in effect."

8. 21 L.P.R.A. Sec. 1254.

9. Ordinance No. 41, Series 1969–70, approved by the Municipal Council on May 12, 1970 and by Mayor Campos on May 13, 1970. Ordinance No. 25, Series 1970-71, approved by Municipal Council on January 13, 1971, and by Mayor Campos on January 14, 1971.

10. 21 L.P.R.A. §§ 1352–1356.

11. 32 L.P.R.A. Sec. 2916.

12. 12 L.P.R.A. Sec. 1124.

ment of the dump. Sometime in 1972, a few days before the opening of the dump, the Environmental Quality Board requested Mayor Guillermo Campos in his official capacity to submit the environmental impact statement. At the close of the hearings, no impact statement had been submitted, and Mr. Campos informed the Court he had no intention to file it. Plaintiffs had no knowledge of the fact that the Environmental Quality Board had notified the Governor that it had no objection to the dump site.

20. Mrs. Celia López de Ortega, one of the plaintiffs, filed a written complaint before the Environmental Quality Board on the month of August 1971, regarding her opposition to the new dump site because of the environmental hazards involved. This complaint was notified to Guillermo Campos in his official capacity as Mayor of Bayamón. The Environmental Quality Board, without a hearing of any sort and *ex-parte*, dismissed the complaint. Mayor Guillermo Campos was notified of this resolution of the Environmental Quality Board. However, Mrs. Celia López de Ortega, a complainant, was not notified of the dismissal of her complaint. The usual procedure, as testified by Mr. Santos Rohena, Assistant Director of the Environmental Quality Board, who is in charge of the Solid Waste Disposal, is to notify to all parties involved all orders or resolutions of the Board. No explanation as to this exception to the rule in this specific instance was given by Mr. Santos Rohena, although he personally investigated this complaint.

21. Realizing the futility of their actions before the different governmental agencies, and seeing works undertaken to open the new dump, plaintiffs, on their own behalf and on behalf of all similarly situated, filed suit at the Superior Court of Puerto Rico, Bayamón Part, on November 9, 1971, Civil 71–4514, requesting injunctive relief against the Municipality of Bayamón. Mr. Guillermo Campos was served summons in his official capacity of Mayor in that suit. A motion requesting extraordinary remedies was filed on January 21, 1972. A hearing was held on January 25, 1972, at which Mr. Guillermo Campos was present. Without any evidentiary hearing, the Superior Court Judge dismissed the motion for extraordinary remedy and the preliminary injunction.[13] Plaintiff appealed that decision and final resolution was pending before the Supreme Court of Puerto Rico, 0–72–41, when this case was submitted.[14]

22. The new Municipal dump site was opened to the public on January 27, 1972, at 10:00 a. m. Although for several months the dump site was not operating at full operational capacity, 400 tons of garbage per day have been deposited. This is considered a large sanitary landfill operation.

23. Because of the problems involved in getting rid of solid wastes by open burning, the Environmental Quality Board has started a program to convert the open burning of garbage system presently used by most municipalities of Puerto Rico to the solid waste landfill method. Although this will not be the ultimate solution to this problem it is quite an improvement on the open burning system.[15]

13. Under 32 L.P.R.A., Sec. 3524, before obtaining injunctive relief against a governmental officer or a public officer, first a declaratory judgment must be obtained in which the unconstitutionality of the act or governmental action must be determined. Arrarás v. Superior Court 0–7–25, decided on January 27, 1972, —— P.R.R. ——; Jiménez v. Jiménez, 71 P.R.R. 469.

14. The Supreme Court of Puerto Rico later reversed the Superior Court, finding that it has jurisdiction to entertain the case in this injunctive procedure because the acts complained of are not authorized by law and, hence do not fall under the scope of the local anti-injunction Act. Ortega Cabrera, et al. v. Tribunal Superior, 0–72–41, 73 Col. Abo.Sec. 86 (September 10, 1973).

15. Before the creation of the Environmental Quality Board this project was started by the Health Department of the Commonwealth of Puerto Rico.

Several aspects must be taken into consideration prior to establishing a sanitary landfill project, because of the danger of ground and surface water pollution. Among these, some of the most important are the following: [16]

1. Initial in depth geological studies of the area selected for the dump site.

2. Extensive hydrological studies of the area. The water table should be located; the dump site must be constructed at a safe distance from streams, wells, rivers and other water sources, since there is a high possibility of water pollution. Also, since the garbage will be decomposed anaerobically, any water source will destroy the feasibility of this procedure, ruining the project. This damage is irreversible.

3. Good drainage system and good compaction of the solid material is essential; care should be taken in regard to the quality and quantity of the material to be used in the compaction.

4. Adequate equipment for compaction and adequate selection of garbage material to be compacted is essential.

5. Site location of dump above kind of subsurface that will lead the leachate from the landfill to water sources should be avoided.

6. Good vector control and fencing are required for good and safe operation of sanitary landfill project.

None of the above essential requirements for the establishment and operation of an adequate sanitary landfill project were met in the case of the Bayamón Municipal dump site.

25. In spite of plaintiffs' repeated complaints, reiterated throughout three (3) years prior to the establishment of the dump, complaints directed to Mayor Guillermo Campos, the Department of Health, the Environmental Quality Board, the Planning Board, and other government agencies, it was not until after the filing of the present court action that defendant and his agents undertook to the sampling of water from the springs and wells in the vicinity, to be examined for signs of pollution, as well as making borings to ascertain the water table of the dump site area.

26. After the operation of the dump started, surface water pollution has affected the creek that crosses plaintiffs' property. The bacteriological, chemical and physical water tests results submitted in evidence by both parties clearly indicate that there is a continuous increase in pollution.[17] Lead and mercury were also found in quantities above the maximum permissible.

27. There is water pollution coming from the dump yard through underground channels that affects all springs that start at the dump area on to River La Plata. The closer to the Municipal dump the spring is located, the higher its degree of pollution. This pollution has increased with time elapsing after establishment of the dump.

28. Land, debris, foul-smelling, decomposed organic matter and silt from the dump has almost covered the ponds in the creek, where plaintiffs and other neighbors of the area used to fish, drink, swim, and enjoy outings.

29. Plaintiffs and other neighbors who used their land for the grazing of livestock can no longer do so safely since the surface and underground water is highly polluted. There is the continuous

16. Sanitary Landfill Facts, U. S. Department of Health, Education and Welfare, Public Health Service, Environmental Health Service, Bureau of Solid Waste Management, 1970.

17. Public Health Service Drinking Water Standards—1962. Public Health Service Publication No. 956, Superintendent of Documents, Washington, D. C.; Sanitary Regulation No. 129, Department of Health, Commonwealth of Puerto Rico—Approved on December 29, 1967.

threat that if the livestock drinks or comes in contact with the polluted water, it can become infected and even a vector or carrier of disease to human beings.

30. Water seeping from above and below into the garbage and dirt material in the dump, plus the depositing of approximately four hundred (400) tons of garbage daily, has created an unstable mass of garbage and fill susceptible to mass wastage movement that, considering the topography of the valley, will continue causing pollution to the waters in lower levels.

31. The construction of a ladrone or underground artificial channel to discharge the water and leachate from the dump was started by defendant sometime after the suit had been filed by plaintiffs, but it proved ineffective to accomplish its purpose.

32. Defendant, with the cooperation of government officials from different agencies of the Commonwealth of Puerto Rico, had an earthen dam constructed to prevent water and leachate coming from the dump from getting into plaintiffs' property, with the consequent pollution of their water supply, but this measure was of no avail in solving the problem.

33. The dump site was not properly selected [18] thus causing pollution of waters, with consequent damages to plaintiffs.

34. The following irreparable damages are being suffered by plaintiffs and other similarly situated:

1. Four hundred tons of garbage are deposited daily in the Bayamón dump. The dump is located in an area with springs, next to a creek. This brings about pollution of these bodies of water, constituting a health hazard and causing obvious irreparable damages to plaintiffs.

2. Water contaminated with lead and mercury in amounts above those permitted by the U.S. Public Health Standards of 1962 is flowing into the water supply and property of plaintiffs. These highly toxic substances cannot be removed from water.[19]

3. Underground water pollution of wells of plaintiffs is being caused, with lead, mercury, orthophosphates and nitrates.[20] The percentage of pollution has increased

---

18. Excerpts of testimony of witness Santos Rohena, Associate Director of the Environmental Quality Control Board in charge of Solid Waste Disposal Section, testifying for defendant as an expert on sanitary landfill, on March 27, 1972; follow:

"THE COURT: It might be a matter of credibility, but one of the witnesses testified—perhaps two testified—to the effect that there were springs emanating from the place where the dump is at present. Another witness, Mr. Rosado, testified there were no such springs. As a hypothetical question it may be permitted, without meaning that the Court is concluding, as a matter of fact, that there were or not springs in that place. Assuming there were some natural springs in the place where the dump was constructed, go ahead.

Q Would you advise to build a dump yard covering 22 acres?

A If there were any springs or surface waters. If we find any manifestation of this, we will not recommend the development of a sanitary landfill. We will not recommend any development of a site on that area.

Q If a municipal dump yard has been installed on a 22-acre lot as described, and you were asked if it should be moved to a more suitable place, what would be your answer?

A Assuming there is water, we will not recommend that.

MR. APONTE: That is not the question.

Q Would you recommend it be moved to a more suitable place?

A If there is a situation like that, it has to be moved."

19. Exhibits W(1) and W(2) and testimony of expert witnesses, Chemical Engineer Ferdinand Quiñones of the U.S. Geological Survey and Dr. Antonio Rivera Cordero of the Department of Public Works of the Commonwealth of Puerto Rico.

20. Exhibits W(1) and W(2) of defendant show an increase in lead, mercury, orthophosphates and nitrates in the plaintiffs' wells, after pumping them, under the supervision of the Department of Health of the Commonwealth of Puerto Rico.

with the passage of time and with the closeness to the dump.

4. Loss of safe drinkable water due to pollution of the springs, wells and creek used by plaintiffs, and along with it the loss of enjoyment of plaintiffs for such simple and bucolic activities as swimming, fishing, picnicking, outings, and the spiritual satisfaction that derives from the direct contact with unspoiled nature.

After reviewing the conclusions of facts in the instant action, the Court finds the following:

## CONCLUSIONS OF LAW

1. Jurisdiction is properly asserted under the Civil Rights Act of 1871, 42 U.S.C.A. § 1981 et seq., specially § 1983 and its jurisdictional counterpart 28 U.S.C.A. § 1343, as well as the Federal Question Statute, 28 U.S.C.A. § 1331, and the Declaratory Judgment Act, 28 U.S.C.A. § 2201.

2. The doctrines of exhaustion of available local remedies and abstention is not applicable in the present action under the Civil Rights Act. The Court analyzed this issue exhaustively in the case of Vistamar Marina v. Vázquez, D.C., 337 F.Supp. 375, ratifying its previous decision in Inmobiliaria Borinquen v. Santiago, 295 F.Supp. 203. We do not deem proper in this case to modify the above ruling, specially in view of the fact that plaintiffs resorted to and tried to obtain local remedies without success for almost three years.

3. Plaintiffs have a property right of use of waters coming from springs and creeks arising at the dump site area, which run through their property, under 12 L.P.R.A. § 525, which states:

"The rights to use indefinitely the waters from creeks and springs is acquired by the owners of the lower estates, and in proper case, by the riparian estate, when they shall have made use thereof uninterruptedly for a period of twenty years."

4. As landowners, plaintiffs have the right to the free and peaceful enjoyment of their property, without the threat to their life, health, safety, and property posed by improper interference by the government officials, under color of law.

5. Defendant Campos' actions under color of law in his official capacity as Mayor of Bayamón were based upon Municipal law [21] and ordinances [22] approved by the Municipal Council and by Mayor Campos.[23]

6. The Civil Rights Act, 42 U.S.C. § 1983, does not only protect personal liberties but property rights as well. See Lynch v. Household Finance Corporation, 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972). It is not necessary, however, that the property involved be completely destroyed in order for the law to apply; it is only necessary that the property right or its peaceful enjoyment be affected adversely. Thus, airplane noise of such a high level can be a taking;[24] odors and smoke can be a taking;[25] destruction of an easement;[26] the freezing of a property by the government,[27] or a long-

21. 21 L.P.R.A. §§ 1251, 1254 and 1255.

22. Ordinance No. 41, Series 1969–70, approved by the Municipal Council on May 12, 1970 and by Mayor Campos on May 13, 1970. Ordinance No. 25, Series 1970–71, approved by the Municipal Council on January 13, 1971 and by Mayor Campos on January 14, 1971.

23. 21 L.P.R.A. §§ 1163, 1164 (Municipality v. Ríos, 61 P.R.R. ——).

24. United States v. Caussby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206; Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962).

25. Richards v. Washington Terminal, 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088.

26. State v. Jacobs, 7 Ariz.App. 396, 440 P.2d 32; Morrison v. Thelberg, 87 Ariz. 318, 350 P.2d 988; State ex rel. Herman v. Wilson, 103 Ariz. 194, 438 P.2d 760.

27. Vistamar Marina v. Vázquez, D.C., 337 F.Supp. 375; Inmobiliaria Borinquen v. Santiago, 295 F.Supp. 203.

standing threat to condemn [28] have been similarly considered.

■ In the present situation, plaintiffs' property rights and its use and enjoyment are endangered by defendants' action. The pollution of the creek and springs is of such magnitude that it resembles an illegal taking of their property.

■ 7. In the present action, there is a substantial federal question involved, as well as issues under local law. The federal courts in specifical instances can determine local issues and federal issues; Levering & Garriges v. Hurn, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062 (1933); Hurn v. Ousler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); Armstrong Co. v. Nu-Enamel Corp., 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195 (1938); Hillsborough v. Cromwell, 326 U.S. 620, 66 S.Ct. 445, 90 L.Ed. 358 (1946); Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); Wheeldin v. Wheeler, 373 U.S. 647, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1962); Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).

In Mine Workers v. Gibbs, *supra*, the rule was stated, 383 U.S. at page 725, 86 S.Ct. at page 1138, as follows:

"The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. Levering & Garriges Co. v. Morrin, 289 U.S. 103, 53 S.Ct. 549, 77 L.Ed. 1062. The state and federal claims must derive from a common nucleus of operative fact. But if considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.

"That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims even though bound to apply state law to them, Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals. There may, on the other hand, be situations in which the state claim is so closely tied to questions of federal policy that the argument for exercise of pendent jurisdiction is particularly strong."

■ In the present case, the Court determines that it will do better justice to all parties involved if all issues are settled in the present suit.

■ 8. Under the Environmental Public Policy Act, 12 L.P.R.A. § 1121 et seq., defendant, Mayor Campos, in his official capacity, had a duty and was required to, but never filed, an environmental impact statement before the Environmental Quality Control Board, as per Section 1124(C)(i), (ii), (iii), (iv) and (v), prior to undertaking any activity towards the construction of the Bayamón dump. Zabel v. Tabb, 430 F.2d 199 (5

28. Boulevard Realty Corp. v. Providence Re-Development Agency, D.C., 308 F.Supp. 224.

Cir. 1970), cert. denied 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971); Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). Noncompliance by the government agency is sufficient ground to grant injunctive relief. West Virginia Highland Conservancy v. Island Creek Coal Co., 441 F.2d 232 (4th Cir. 1971); Environmental Defense Fund, Inc. v. Corps of Engineers, D.C., 325 F.Supp. 749; National Helium Corp. v. Morton, D.C., 326 F.Supp. 151.

9. Under the local nuisance law, 32 L.P.R.A. § 2761, injunctive relief lies where someone creates a nuisance that disturbs the free use of property, in such a way as to interrupt the comfortable enjoyment of life or property. Marín v. Herrera, 61 P.R.R. 624; Carreras v. Municipio, 56 P.R.R. 90; Martínez v. Puerto Rico Coconut Industries, 68 P.R.R. 226; Arcelay v. Sánchez, 77 P.R.R. 782. The dangerous situation created by the underground and surface water pollution are sufficient grounds for issuing an injunction.

10. Under Sanitary Regulation No. 129, approved on December 29, 1967, the public policy of the Commonwealth of Puerto Rico, in regard to the use of water, is formulated as follows in Article IV, page 3:

"Because of the territorial limitations of the Commonwealth of Puerto Rico, its high population density and the scarcity of surface water resources it is considered for the purpose of this regulation that *all* surface waters in Puerto Rico are or will be used as sources of public water supply systems." (Emphasis added.)

The increase in pollution of waters created by the Municipal dump at Bayamón, in violation of the water quality standards set in the above regulation, is sufficient ground to grant injunctive relief.

11. Plaintiffs request that an injunction be granted in the present action while defendants allege, in the alternative, that there are no grounds for injunctive relief or that monetary compensation should be the best relief in the present action.

The equity powers of the Federal District Courts are the same ones of the English Courts of Chancery in 1789, unless specifically enlarged or diminished by Congress. In Re Sawyer, 124 U.S. 200, 8 S.Ct. 482, 31 L.Ed. 402; Gordon v. Washington, 295 U.S. 30, 55 S.Ct. 584, 79 L.Ed. 1282; Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184.

In regard to civil rights, the use of equitable power of injunctive relief has been made in various instances to protect citizens' constitutional rights of peaceful assembly and liberty of speech. Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; Dombrowsky v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22. Property rights deserve equal protection. Lynch v. Household Finance, 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424; Ex parte Young, 209 U.S. 122, 28 S.Ct. 441, 52 L.Ed. 714; United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171; Weiser Valley Water Co. v. Ryan, 190 F. 425; People v. Colorado, 10 Cir., 207 F.2d 50; Progress Development v. Mitchell, 7 Cir., 286 F.2d 222, Cobb v. City of Malden, 1 Cir., 202 F.2d 701; Inmobiliaria Borinquen v. Santiago, *supra.*

A correct approach in the issue regarding the granting of an injunction in the present action is the balance of interest test. See: City of Harrisonville v. Dickey Clay Mfg. Co., 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208; Richards v. Washington Terminal, 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088; Harris v. Skirving, 41 Wash.2d 200, 248 P.2d 408; Mack v. Town of Craig, 68 Colo. 337, 191 P. 101; Progress v. Mitchell, *supra*; Weiser Valley Water Co. v. Ryan, *supra.* A complete analysis of all evidence presented in the instant action heavily inclines the balance in favor of granting injunctive relief against defendant Guillermo Campos, in his official capacity as Mayor of Bayamón, and his successor, since the Municipal Dump

is not working correctly, will not work correctly unless real efforts are made to make the necessary repairs, and all efforts so far made to correct the damages have been unsuccessful. However, this Court's equitable power will be exercised with care so as not to interfere unduly with the administration of the Municipality.

Even though the Court found no special difficulty in arriving at its conclusions not in solving the juridical problems posed by this case, it has found almost impossible to arrive at a remedy to discontinue the irreparable damages being caused to plaintiffs by defendants. The dilemma has really been almost unsurmountable. The problem is that every remedy that occurs to us is either without legal foundations in which to be based or just worse than the evil it pretends to correct. We must explain why. A careful balancing of the opposing interests at stake is necessary if the traditional bounds of equitable relief are not to be overstepped. In other words, if it is legal, we were to follow the law literally, this would cause more damages than the ones to be eliminated.

As it has been explained in the foregoing pages, the action sought to be enjoined by defendants is the operation by defendants of the Municipal Dump in its present site. When the petition was filed in this case, the dump had already been in operation for some time. When the case, which was protracted for quite some time for good reasons owing to difficulties encountered by both parties, was finally submitted to the Court for decision, the dump site was practically full. Layers of garbage and sand have been compacted almost all over the area, at a rate of 400 tons per day for approximately two years. And the water that emanates from the spring and becomes polluted with the everyday more decayed matter contained in the garbage continues to pollute the once clear water of the stream and wells of the plaintiffs.

As a remedy, the plaintiffs propose that defendants be ordered to cease operating the Municipal Dump, start a new dump yard in a more suitable location, and to remove all the garbage material now deposited in the dump area to another place, so that it stops contaminating the nearby stream and wells, or, in the alternative, that they start forthwith condemnation procedures in the Commonwealth courts to obtain title to all the properties belonging to plaintiffs, including the fifteen structures erected in the different farms. The Court cannot please the plaintiffs one way or the other. As to the possibility of ordering condemnation procedures, we fail to see any authority in the law that could warrant such an extreme action. As to the possibility of removing hundreds of thousand of tons of decayed matter and moving it through the public highways, the Court feels that it would be a very risky, if not an altogether impossible maneuver that would endanger the public health of a whole community, trying to remedy a much smaller health hazard to a few citizens, members of the same community who, together with the rest, will suffer greater health hazard caused by the moving garbage.

During the course of the trial, the defendants, obviously realizing that the contaminated water running from the garbage area was running down to the lower neighboring lands and causing the damage we are dealing with in this case, made some construction works trying to correct the situation. For reasons unknown to the Court, probably for the haste with which the work was performed, the damage could not be corrected. This does not mean, though, that some construction work that can put an end to the evil is impossible. Somehow it has to be corrected. And the cost of the project, complicated as it may be, must of necessity be lower than the condemnation of a huge tract of land that serves no public purpose or than the moving of an immense amount of decayed matter, to the risk of the public health and safety. Therefore, the Court will order the defendants to proceed as soon as practicable with the necessary remedial construction works and to re-

port to the Court within the next ninety (90) days whether the project has been finished or what progress has been accomplished to that end.[29]

Injunctive relief will be granted in the manner explained above.

The amount for damages to be awarded to plaintiffs will be decided after hearings solely for that purpose to be held as soon as the plaintiffs so request and a trial date is set by the Court.

In view of defendants' obstinacy, the work entailed by the issues presented and argued, the time and effort spent by plaintiffs' attorneys in the instant case, the Court awards the sum of Fifteen Thousand ($15,000) Dollars, to be paid by defendants as attorneys' fees, plus costs.

The Clerk of the court is instructed to enter judgment for the plaintiffs in the manner explained above.

It is so ordered.

## APPENDIX

After this opinion was typed in its final form and ready to be signed, the case of Spomer v. Littleton, —— U.S. ——, 94 S.Ct. 685, 38 L.Ed.2d 694, decided on January 15, 1974, by the Supreme Court of the United States, came to our attention. Under normal conditions, its holding would have justified a review of the wording of our opinion, even though we would arrive at the same result. The fact that the undersigned Judge has made his resignation effective the day after tomorrow, and that there is still some unfinished business to be performed by him in other equally important cases, forces us to limit ourselves to write only this short appendix to our opinion.

The Mayor who was in office when the facts of this case occurred, and still was when the case was submitted, was succeeded by another person who, of course, was never served with process, although a motion to substitute him in regard to injunctive relief was filed by plaintiffs on October 25, 1973.

At first sight, the Spomer case would seem to indicate that the dispute regarding the availability of injunctive relief against the Mayor is now moot and that the only relief that plaintiffs are entitled to would be to amend their complaint to include claims for relief against the new Mayor. We do not think so. We believe that the facts of this case are so different—not merely distinguishable—from those found in Spomer that the Supreme Court would have never reached a similar result in view of the language the High Court used in page 689 of its unanimous opinion, which made clear that

"[t]he injunctive relief requested against former State's Attorney Berbling, moreover, is based upon an alleged practice of willful and malicious racial discrimination evidenced by enumerated instances in which Berbling favored white persons and disfavored Negroes. The wrongful conduct charged in the complaint is personal to Berbling, despite the fact that he was also sued in his then capacity as State's Attorney. No charge is made in the complaint that the policy of the office of State's Attorney is to follow the intentional practices alleged, apart from the allegation that Berbling, as the incumbent at the time, was then continuing the practices he had previously followed. Cf. Allen v. Regents of the University System of Georgia, 304 U.S. 439, 444–445 [58 S.Ct. 980, 82 L.Ed. 1448] (1938). Nor have respondents ever attempted to substitute Spomer for Berbling after the Court of Appeals decision, so far as the record shows, or made any record allegations that Spomer intends to continue the asserted practices of Berbling of which they complain. The plain fact is that, on the record before us, respondents have never charged Spomer with anything and do not presently

29. See Appendix.

seek to enjoin him from doing anything."

A close reading of footnote 10 at page 689 of the opinion of the Court, which outlines certain parts of the appellate record and oral argument of counsel as giving rise to misgiving by the justices in rendering a decision on the merits, reveals that nothing of the sort occurred in the case at bar. Thus, it is impossible for us to be concerned "that we are being asked to render an opinion on the merits of what is now and may continue to be a hypothetical abstract dispute."

Our decision shall remain the same in spite of the *Spomer* case.