**CORDECO DEVELOPMENT CORPORATION,**
Plaintiff-Appellant,

v.

Antonio **SANTIAGO VASQUEZ** et al.,
**Defendants-Appellees.**

**CORDECO DEVELOPMENT CORPORATION,**
Plaintiff-Appellee,

v.

Antonio **SANTIAGO VASQUEZ** et al.,
**Defendants-Appellees.**

Inez **Acevedo Campos** et al.,
**Defendants-Appellants.**

Nos. 75–1424, 75–1457.

United States Court of Appeals,
First Circuit.

Argued Feb. 11, 1976.

Decided June 25, 1976.

John J. Bower, New York City, with whom Charles A. Cordero, San Juan, P. R., and Michael M. Futterman, White Plains, N. Y., were on brief, for Cordeco Development Corp.

Ronaldo Rodriguez Ossorio, Asst. Sol. Gen., with whom Miriam Naveira de Rodon, Sol. Gen., San Juan, P. R., was on brief, for Antonio Santiago Vasquez and Pedro Negron Ramos.

A. Santiago Villalonga, San Juan, P. R., with whom Hartzell, Ydrach Mellado, Santiago, Perez & Novas, San Juan, P. R., was on brief, for Inez Acevedo Campos and Zenon Mercado.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

The present appeals arise from a suit for damages and injunctive relief brought by plaintiff Cordeco Development Corporation ("Cordeco") against four officers of the Commonwealth of Puerto Rico, charging a violation of plaintiff's constitutional rights under 42 U.S.C. §§ 1983, 1984 and 1985. The court *sua sponte* empanelled an advisory jury, pursuant to Fed.R.Civ.P. 39(c), which rendered a verdict on May 14, 1975, in the form of answers to special interrogatories propounded by the court. The court accepted most of the jury's findings with respect to liability, but reduced the damages awarded Cordeco.

The district's court's findings are set forth in its unpublished opinion of October 22, 1975. Mr. Carlos Cordero purchased a parcel of land from Mrs. Antonia Abreu Diaz by deed dated December 30, 1956. This tract was part of a larger parcel which had been subdivided in 1948 into six tracts of approximately equal value. Mr. Cordero paid $6,400 for his parcel and used the land as a farm in subsequent years. The northern boundary of the tract was described as the "dunes of the maritime zone," and these dunes contained approximately 800,000 cubic meters of sand. As a result of a sharp increase in construction activity in Puerto Rico there was a greatly increased demand for sand, and by 1967 the dunes on Mr. Cordero's land became very valuable commercially. In 1970 he sold the land to the plaintiff Cordeco, a corporation established and controlled by his family for the purpose of mining sand. On June 10 of that year plaintiff petitioned the Department of Public Works[1] for the requisite permit to extract sand. No action was taken on plaintiff's petition despite the fact that Section 3.6 of the Regulations of the Public Works Department required that action be taken on such petitions within 60 days. Plaintiff's petition was initially referred to defendant Mercado, an official in the department, who did not act upon it; after numerous protestations by plaintiff, Mercado referred Cordeco's counsel to defendant Acevedo, the department's legal advisor. Acevedo "denied that plaintiff owned the land" in question, but took no definitive steps to resolve the matter. In the meantime, permits to extract sand had been granted to members of the Abreu family, the owners of the five tracts of land which surrounded plaintiff's parcel.[2]

---

1. In January, 1973 the Department of Public Works was abolished and its powers and functions transferred to the newly created Department of Natural Resources. 3 L.P.R.A. §§ 152, 156 (1974). This change had no substantive effect on any aspect of the present case.

2. In 1970 the members of the Abreu family, who owned the five other tracts of land, filed suit against Cordeco to determine the boundaries of the land conveyed to it by Carlos Cordero. They alleged the original deed to Mr. Cordero did not include the sand dunes. The district court, on March 18, 1975, dismissed the complaint and held that Cordeco was the own-

In December, 1973 Cruz Matos, then Secretary of the Department of Natural Resources of the Commonwealth, issued a permit to the plaintiff for extracting sand; however, the terms of this permit excluded the area of land containing most of the sand dunes on plaintiff's property. The permit was granted in this form pursuant to the recommendations of the defendants Acevedo and Mercado.[3] Defendant Negron Ramos became Secretary of the Department of Natural Resources in August, 1974 but took no action on Cordeco's petition for a sand extraction permit because the one issued in December, 1973 by his predecessor was still in force and no new application had been received.

Cordeco's contention at trial was essentially that the failure of the defendants to act on its sand excavation application and the subsequent issuance of a useless permit were the product of political pressure exerted by the powerful Abreu family (whose members owned the five surrounding tracts of land) and that by responding to such pressure the defendants denied plaintiff equal protection of the laws in violation of the fourteenth amendment of the United States Constitution. The advisory jury found that each of the four defendants acting singly sought to deprive plaintiff of its rights to equal protection by denying the requested permit to extract sand. However, the jury found that only defendants Acevedo and Mercado acted beyond the limits of their lawful authority or discretion.[4] On the issue of damages the advisory jury held Cordeco was entitled to $500,000 in actual damages and $250,000 in punitive damages. The jury also responded affirmatively to the question of whether plaintiff was entitled to a permit to extract sand. The court's opinion and judgment followed.

Initially we examine the liability of defendants Santiago Vasquez and Negron Ramos. The district court agreed with the advisory jury that these defendants were acting within the limits of their lawful authority in respect to Cordeco's application for a sand extraction permit, and plaintiff has appealed from that aspect of its judgment. We find no error. Defendant Vasquez, as Secretary of the Department of Public Works of Puerto Rico from 1969 to 1973, was empowered to act upon requests for said extraction permits. However, defendant Acevedo, the department's legal advisor, was responsible for the analysis of such petitions from a legal perspective and defendant Mercado was responsible for technical analysis *inter alia*. There is ample evidence to show that for all essential purposes Acevedo and Mercado were the parties in position to control the granting or denial of permits and that, with respect to plaintiff's application, all actions taken were in response to the recommendations of Acevedo and Mercado. When defendant Negron Ramos became Secretary of the Department of Natural Resources in August, 1974 this earlier permit was still in force and Cordeco had not filed a new petition for sand extraction; accordingly Negron Ramos did not have occasion to grant or deny plaintiff's permit application.

As the evidence supports the conclusion that defendants Vasquez and Negron Ramos acted within the bounds of their lawful authority and discretion, the district court properly ruled that they enjoy a qualified immunity as a matter of law and are not subject to liability for their actions with respect to Cordeco's sand extraction permit. *Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *see Wood*

---

er of the entire tract of land, including the dunes.

**3.** The district court noted that Cruz Matos was originally named as a defendant but was dismissed without objection at the beginning of trial when the evidence revealed that he thought that the permit granted to Cordeco included the sand dunes in question.

**4.** In an inconsistency noted by the district court the jury also found defendant Negron Ramos had conspired with Acevedo and Mercado to deprive Cordeco of its constitutional rights to equal protection. The court did not agree with the jury's finding with respect to the liability of Negron Ramos. *See* discussion *infra; Wilson v. Prasse,* 463 F.2d 109, 116 (3d Cir. 1972); *Mallory v. Citizens Utilities Co.,* 342 F.2d 796, 797 (2d Cir. 1965).

*v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

■ With regard to the liability of defendants Mercado and Acevedo, the district court agreed with the advisory jury that these two defendants were not acting within the scope of their lawful discretion or authority in refusing to process Cordeco's application. The court characterized the failure of these two defendants to act on Cordeco's application as "based on illegitimate political considerations," and found them both to have acted "wantonly and with actual malice." The evidence at trial fully supported the inference that the failure of these two defendants to act on Cordeco's permit requests stemmed from improper considerations, viz. the fact that plaintiff's application was opposed by the politically influential Abreu family which owned the five adjacent parcels and Mr. Cordero's own lack of political influence. On appeal, Acevedo and Mercado insist that they acted properly in delaying action on plaintiff's permit request and in recommending the grant of a sand extraction permit not covering the dunes on Cordeco's land because there were inconsistencies in the deeds related to the original subdivision of the Abreu land into six parcels. They point out that the undivided original farm land had an acreage of 179 "cuerdas" whereas the deeds for the six constituent parcels amounted to only about 125 "cuerdas" and that the difference in acreage was possibly due to the exclusion from the deeds

of the dunes "in the maritime zone." The two defendants claim that these differences and inconsistencies, together with the fact that a former owner of plaintiff's parcel had given notice of a dispute over title, created "legitimate doubt" about plaintiff's application for the sand permit which they were required by their positions to investigate with care. However, the district court found that although plaintiff's title to the sand dunes was not totally beyond doubt, defendants Mercado and Acevedo did not fairly raise and present this issue as a basis for not acting on plaintiff's application. Had they done so, the question of the title which was eventually resolved in plaintiff's favor, *see* n.2 *supra,* could have been resolved at an earlier stage and a permit either granted or denied. We think there was ample evidence to justify the court's conclusion that Acevedo and Mercado acted maliciously and wantonly, and with illegitimate "political" or, at least, personal motives, in holding up and seeking to defeat the granting of a license. Accordingly, we affirm the district court's ruling that defendants Acevedo and Mercado, both of whom it found to be acting under color of their official authority, had denied Cordeco's constitutional right to equal protection of the laws and were liable to plaintiff under 42 U.S.C. § 1983.[5]

■ We next examine the issue of damages. The advisory jury awarded plaintiff $500,000 compensatory damages for losses sustained from the withholding of the per-

---

**5.** Although the majority of the court takes no position on this issue, Judge Campbell would make the following observation: Defendants expressly endorsed the district court's jury instructions setting forth its theory of the law with respect to the application here of § 1983 and the fourteenth amendment; and they do not on appeal challenge the legal and constitutional standards that were applied in this case. Therefore, without deciding the issue, the correctness of such standards can be assumed. *Cf. Morris v. Travisono,* 528 F.2d 856 (1st Cir. 1976). The second circuit held thirty years ago in *Burt v. City of New York,* 156 F.2d 791 (1946) that official misconduct like that found here, even though not the systematic, class-based discrimination usually associated with

equal protection violations, fell within the "purposeful discrimination" standard announced several years earlier in *Snowden v. Hughes,* 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944). *See also McFarland v. American Sugar Refining Co.,* 241 U.S. 79, 36 S.Ct. 498, 60 L.Ed. 899 (1916); *Harrison v. Brooks,* 446 F.2d 404 (1st Cir. 1971); *McGuire v. Sadler,* 337 F.2d 902 (5th Cir. 1964); *Everlasting Development Corp. v. Luis Descartes,* 192 F.2d 1 (1st Cir. 1951) (Magruder, J.). *But cf. Simmons v. Jones,* 478 F.2d 321 (5th Cir. 1973). But the paucity of cases in the years since *Snowden* and *Burt* equating equal protection violations with instances of bribery and conflict of interest by state officials suggests that the matter may not, even yet, be finally settled.

mit to excavate sand.[6] The court disregarded this finding and awarded only nominal damages in the sum of one dollar to the corporation on the ground that Cordeco had not actually suffered an economic loss. The court pointed to the uncontradicted evidence presented at trial indicating that in 1970, at the time of plaintiff's application, sand was selling in Puerto Rico for $1.00 per cubic meter and that by 1975 the price had risen to $2.00 per cubic meter.[7] The court held that "the sharp increase in [the] value [of sand] between 1970 and 1975 belies the conclusion that plaintiff was completely deprived of an extremely valuable asset,"[8] and that allowing the jury award "would entail double recovery in this case since the sand remains on the land. . ."

Plaintiff claims it is nevertheless entitled to a damage recovery because there has been a decrease in major construction and a substantial decline in marketability of sand which makes it much more difficult to sell the commodity in 1974 and 1975 than had been earlier.[9] The district court concluded, however, that despite the greater difficulty of selling sand, plaintiff had not suffered any loss because of the increased value of the sand in 1975. The court also ruled that even if plaintiff had suffered an actual present loss, "the amount has not been proven." After careful examination of the entire record we are compelled to agree.

■ Plaintiff's theory of damages in this case is essentially analogous to that based on a claim of tortious interference with business relations. In the instant situation such a theory would require evidence in the nature of loss of profits from sales of the sand, which of course would be offset by the value of the remaining asset. Here, inasmuch as evidence indicates a doubling in the selling price of sand over the relevant

---

6. In its interrogatories the court requested the advisory jury to "State the amount of actual damages, if any, sustained by the plaintiff as a result of having been deprived of a permit to excavate its sand. And this is talking about actual compensatory damages. . . ." The court defined compensatory damages as "compensation for actual losses or damages sustained by the plaintiff by being deprived of the sand permit."

7. The testimony of plaintiff's expert Maldonado indicated that the price of sand per cubic meter in each of the relevant years was as follows:

| | |
|------|-------|
| 1970 | $1.00 |
| 1971 | 1.25 |
| 1972 | 1.50 |
| 1973 | 2.00 |
| 1974–75 | 2.00 |

8. The court also rejected plaintiff's contentions that the increase in commercial value of sand should not be considered in fixing compensatory damages and that the jury award should be sustained on the basis of a simple rate of return on the land during the period in which plaintiff was deprived of its commercial use. Whatever the appropriateness of this measure of damages in cases involving complete deprivation of use of land, we do not think this theory apposite to this case where the plaintiff has remained in possession but has been denied the right, for a period of time, only to deplete an asset of the land. Under such circumstances, the application of a rate of return to total valuation does not seem either realistic or appropriate.

9. Plaintiff's evidence in this regard consisted essentially of the testimony of its expert Maldonado, a licensed civil engineer. On direct examination he stated in pertinent part as follows:

"Q. With respect to the need for sand, we heard some people say that there was a construction boom in Puerto Rico. What happened to the construction boom now?
A. [Maldonado] It has decreased. . . .
Q. How does that reflect on the salability of sand?
A. Well, . . . it has diminished.
Q. Is sand as easy to sell today as it was let us say in 1970, '71 and '72?
A. No, it is not as easy to sell it now [in 1975] as it was in 1970.

. . . . .

Without a doubt construction has diminished."
Cross-examination produced testimony in a similar vein:
"Q. Do you know in your experience as a civil engineer whether in Puerto Rico in general there is a shortage or an excess of sand for sale?
A. [Maldonado] One cannot make sure as to the fact if there is an excess of it or if there is a lack of it but what we can assure is that the buying of sand has diminished due to the fact that construction also has diminished. . . ."

time period, see n.7 supra, plaintiff, to prove the fact of damage, must show that the decline in marketability of the sand decreased its "real" value as an asset below the ostensible selling price; otherwise the value of the remaining sand would more than compensate for plaintiff's alleged lost profits. A party's financial loss is the ultimate measure of his damage, PSG Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 417 F.2d 659, 663 (9th Cir. 1969), cert. denied, 397 U.S. 918, 90 S.Ct. 924, 25 L.Ed.2d 99 (1970), and the purpose of a damage award is to compensate the injured party for loss resulting from the conduct of the wrongdoer, "not to penalize the wrongdoer or to allow plaintiff to recover a windfall." Farmers and Bankers Life Insurance Co. v. St. Regis Paper Co., 456 F.2d 347, 351 (5th Cir. 1972). See Big Rock Mountain Corp. v. Stearns-Roger Corp., 388 F.2d 165, 169 (8th Cir. 1968). However, plaintiff has failed to make the requisite showing.

■ Although it introduced evidence to the effect that the marketability of sand had decreased, this evidence was of a very general nature, see n.9 supra, and provided no clear basis for calculating the extent to which the market decline had reduced the present value of the remaining sand as reflected in the current selling price. In sum, we do not find in the record a sufficient basis for drawing a reasoned conclusion that the deprivation of profits overbalanced the substantial increment in value of the remaining sand. And with respect to the amount of damages, while a plaintiff need not demonstrate the amount of damage with mathematical precision, see Burns Bros. Plumbers, Inc. v. Groves Ventures Co., 412 F.2d 202, 209 (6th Cir. 1969); De-Vries v. Starr, 393 F.2d 9, 18 (10th Cir. 1968), it must provide sufficient evidence to take the amount of damages out of the realm of speculation and conjecture. Locklin v. Day-Glo Color Corp., 429 F.2d 873, 879 (7th Cir. 1970), cert. denied, 400 U.S. 1020, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971); see Tri-State Produce Co. v. Chicago B. &. Q. R. Co., 104 F.Supp. 452, 463 (N.D.Iowa 1952); cf. Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946). As

the district court properly found, plaintiff has here failed to meet that burden.

■ The district court awarded attorney's fees to the successful plaintiff in this action stating: "[t]he denial of plaintiff's constitutional right of equal treatment under the laws was intentional and malicious. . . . [H]ad it not been for the callous disregard of plaintiff's rights . . . the costly, protracted court proceedings in this case would not have been necessary." It found that the award was not for punitive purposes, but was an attempt to arrive at substantial justice and to assure that the courts will remain open to those persons seeking to vindicate their constitutional rights. At common law attorney's fees are not compensable damages, Arcambel v. Wiseman, 3 U.S. (3 Dall.) 306, 1 L.Ed. 613 (1796), nor are they the appropriate measure of punitive damages. Day v. Woodworth, 54 U.S. (13 How.), 363, 371, 14 L.Ed. 181 (1851). Support for the district court's award of attorney's fees, then, can only be found, in the absence of an applicable statute, in the traditional equitable power to award fees when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . ." Alyeska Pipeline Co. v. Wilderness Society, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975).

Under recent formulations of the "bad faith" exception to the American rule, attorney's fees may be awarded for bad faith or oppressive conduct in the events giving rise to litigation. Newman v. Alabama, 522 F.2d 71, 80 (5th Cir. 1975); Stolberg v. Members of Board of Trustees, 474 F.2d 485, 490–91 (2d Cir. 1973); McEnteggart v. Cataldo, 451 F.2d 1109, 1112 (1st Cir. 1971); Bell v. School Board, 321 F.2d 494 (4th Cir. 1963). Part of the underlying rationale of this exception is to shift the burden of expense in resorting to the courts to vindicate constitutional rights purposefully denied. This interpretation of the "bad faith" exception appears to us, however, both a departure from the traditional concept which authorized an award of fees for bad

faith in bringing suit or in the course of litigation,[10] and a significant policy decision concerning access to the courts. Accordingly, we question whether the imposition of fee awards for wrongful conduct in the events leading to suit can be reconciled with the rationale of *Alyeska, supra.*[11]

▮ We do not need to resolve this question here. Whatever the parameters of the "bad faith" exception, fees should be awarded under its authority only in extraordinary circumstances and for dominating reasons of justice, *Fleischmann Corp. v. Maier Brewing Co.,* 386 U.S. 714, 718, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); 6 J. Moore, Federal Practice ¶ 54.77[2] at 1709–11 (2d ed. 1971). To the extent that the district court premised the award of fees on the nature of defendants' acts giving rise to the lawsuit, the circumstances of the present case make such an award inappropriate. Plaintiff sought compensatory and

punitive damages, as well as equitable relief in the district court. It was awarded punitive damages in the amount of $15,000 against two defendants. Traditionally, punitive damages have been considered a more precise measure of a defendant's wrongful conduct than an award of fees, *Vaughan v. Atkinson,* 369 U.S. 527, 540, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962) (Stewart, J., dissenting); *Day v. Woodworth,* 54 U.S. (13 How.) *supra* at 371, 14 L.Ed. 181, and to the extent that an award of fees under the "bad faith" exception is punitive, *Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1972), the district court's award of both fees and punitive damages for conduct giving rise to the lawsuit constitutes double punishment for such action.[12] Therefore, we set aside the district court's award of fees, and remand for consideration of defendants' conduct during the pendency of the lawsuit.[13]

10. *In re Boston & Providence R.R.,* 501 F.2d 545, 549 (1st Cir. 1974) (bringing vexatious action); *In re Swartz,* 130 F.2d 229, 231 (7th Cir. 1942) (abusive motions in bankruptcy proceeding); *Buchhalter v. Rude,* 54 F.2d 834 (10th Cir. 1932) (claim conceived in bad faith); *see Parker Rust Proof Co. v. Ford Motor Co.,* 23 F.2d 502 (E.D.Mich.1928) (extraordinary expenses of action, not specified to include fees, awarded due to unreasonable defense positions). *See generally* Comment, *Court Awarded Attorney's Fees and Equal Access to the Courts,* 122 U.Pa.L.Rev. 636, 660 (1974). *But see Rolax v. Atlantic Coast L.R.R.,* 186 F.2d 473 (4th Cir. 1951).

The Supreme Court has not definitively ruled upon the content of the traditional "judicially fashioned" exception based upon bad faith or oppressive conduct. In the single case in which it purported to approve an award of attorney's fees under this exception, *Vaughan v. Atkinson,* 369 U.S. 527, 539–41 S.Ct. 997, 8 L.Ed.2d 88 (1962), the defendant acted wrongfully in the events leading to the lawsuit. But *Vaughan* was subsequently read, *Fleischmann Corp. v. Maier Brewing Co.,* 386 U.S. 714, 718, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), as a case affirming attorney's fees as compensable damages under traditional admiralty practice. *See The Apollon,* 22 U.S. (9 Wheat.) 362, 379, 6 L.Ed. 111 (1824). *See also Robinson v. Pocahontas, Inc.,* 477 F.2d 1048, 1051 (1st Cir. 1973); G. Gilmore & C. Black, The Law of Admiralty 313 (2d ed. 1975). The remaining Supreme Court comment is incomplete and inconsistent. In a footnote to *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402

n. 4, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) (per curiam), the Court describes the exception as if it applied only to wrongful conduct during the pendency of a lawsuit. In a passing reference in *Hall v. Cole,* 412 U.S. 1, 15, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1972), Mr. Justice Brennan suggests that attorney's fees may be awarded for bad faith either in the actions that led to the lawsuit, or in the conduct of litigation.

11. Under *Alyeska,* it is the province of Congress to control changes to the American Rule requiring each party to bear its own attorney's fees. Subject to the traditional "judicially fashioned exceptions", to which Congress is deemed to have acquiesced, 421 U.S. at 260, 95 S.Ct. 1612, federal courts are not free to award fees to litigants except under the authority of a statute. If as we suggest in the text, an award of fees for bad faith on the part of the defendants in the events leading to a lawsuit is a significant departure from the traditional exception, Congress could not be deemed to have agreed, by long forebearance, to their imposition.

12. We explicitly reserve decision as to whether the award of attorneys' fees under the "bad faith" exception would be appropriate in the absence of an award of punitive damages.

13. Without expressing any substantive view as to the nature of defendants' conduct while the lawsuit was pending, we note that approximately four years elapsed from the time plaintiff commenced suit in October, 1971 (*see* Fed.

*Remanded for proceedings in accordance herewith.*

R.Civ.P. 3), until the date the district court issued its decision, and that during this period plaintiff continued to be denied an extraction permit.