Jose ORTEGA CABRERA et al.,
Plaintiffs, Appellants,

v.

MUNICIPALITY OF BAYAMON et al.,
Defendants, Appellees.

No. 75–1481.

United States Court of Appeals,
First Circuit.

Argued Feb. 14, 1977.
Decided Sept. 9, 1977.

Arturo Aponte Pares, Hato Rey, P. R., with whom Olaguibeet A. Lopez Pacheco, Hato Rey, P. R., was on brief, for plaintiffs, appellants.

Irwin Zemen, Santurce, P. R., for Manuel Aponte Borrero, defendant, appellee.

Jose M. Ramos, Bayamon, P. R., for Guillermo Campos, defendant, appellee.

Before COFFIN, Chief Judge, VAN OOSTERHOUT *, Circuit Judge, and CAMPBELL, Circuit Judge.

* Of the Eighth Circuit, sitting by designation.

COFFIN, Chief Judge.

Plaintiffs are the occupants of four tracts of land in the Buena Vista Ward of the municipality of Bayamon, Puerto Rico. In January, 1972, the municipality opened a sanitary landfill near plaintiffs' properties, the operation of which interfered in a variety of ways with plaintiffs' peaceful enjoyment of their lands. Plaintiffs instituted this action to obtain injunctive and monetary relief from the municipality, its former mayor, Guillermo Campos, and his successor, Manuel Aponte Borrero. In January, 1974, the district court entered an injunction that essentially ordered the municipality to engage in construction at the dump site that would minimize the damage to plaintiffs' property. Following a separate hearing on damages, the district court set aside substantial jury verdicts rendered in favor of each of the plaintiffs against the individual defendants. Plaintiffs now appeal, contending that broader injunctive relief was required as a matter of law and that the district court erred in entering the judgment notwithstanding the verdict.

## I.

The critical facts are set forth in the district court opinion granting the injunctive relief. 370 F.Supp. 859 (D.P.R.1974). We will summarize only those additional facts which are relevant to the issues now before us.

Beginning in the late 1960's, the municipality of Bayamon decided that it needed a new city dump. Because open air burning had been prohibited, the new dump was to be operated as a "sanitary landfill", a method of disposing of solid wastes which, if established and operated in accordance with sound engineering practices, will present no dangers whatsoever to the environment or to public health. At such landfills, wastes are deposited in a highly controlled manner. A portion of the site is first excavated. When the solid wastes arrive, they are compacted and spread in thin layers over prepared areas. The wastes will be covered daily, or more frequently if necessary, with at least six inches of top soil, and the cover material is itself compacted daily. When the site is completely filled with waste, additional topsoil is laid down and grass planted. At this point, there will be no traces of the solid wastes, and the land will be suitable for a variety of uses, normally recreational ones.

While "sanitary landfills" have been employed successfully throughout the United States, the Bayamon project was, by any standard, a failure. The primary, although not only, reason was that the planners selected a wholly inappropriate site for the landfill. Solid wastes ordinarily contain many contaminants and infectious materials. Since serious health hazards can result if such pollutants are permitted to enter water supplies, it is critical that sanitary landfills be located in places where there is no danger that water will pass through the solid waste and cause ground or surface water pollution.

The site the municipality selected could scarcely have been worse. Presumably because it wished the new dump to be close to the old one, the city located the landfill in the uppermost part of a ravine in a mountainous section of the municipality which enjoys a heavy average annual rainfall of between 75 and 80 inches. The site is right above the headwaters of a creek which flows into the La Plata River, one of Puerto Rico's largest sources of drinking water, and is both the situs of at least one major underground spring and the terminal point of several other creeks.

The record reflects, and the district court found, that this site was selected after several feasibility studies were performed, and after several official tribunals of the Commonwealth had acted favorably upon the proposal. But there seems to be no question but that the decision to go ahead with the dump at this site was reached in violation of numerous personal assurances which had been given various of the plaintiffs and in patent disregard of several provisions of local law, including Puerto Rico's Public Policy Environmental Act, 12 L.P.R.A. § 1121 et seq. See 370 F.Supp. at 862–63, 868–69. The individual ultimately responsi-

ble for the decision was the mayor of Bayamon, Guillermo Campos, but he relied in large part on the recommendations of his subordinates. While there were some Cassandra-like figures who warned of the danger, the record reflects that many of the municipal and other officials clearly favored the proposal.

The landfill opened in January, 1972, and sometime thereafter it reached its full operational capacity of 400 tons of garbage per day. The baleful effects of the dump began immediately. Water entered the solid waste mass from the several creeks that flowed into it, from the internal springs within it, and from the rainfall that seeped through the cover soil. Initially, the solid waste absorbed the water, but it eventually reached a point of total saturation. The addition of further water then resulted in the production of "leachate"—that is, water which had percolated through a solid waste mass carrying with it contaminates in a soluble and suspended state. The leachate, which was yellowish brown, would ooze out the tail of the landfill into the headwaters of the creek, polluting it with contaminants which included unsafe amounts of arsenic, lead, mercury, fecal coliform, and fecal streptococci. Because of the leachate, the creek waters emitted malodors and turned a brownish color.

The dump was closed by court order in January, 1974, and thereafter, the maintenance of the landfill became sporadic, if there was any at all. The steady flow of water through the landfill caused erosion in the top soil, which was the most pronounced at the perimeters of the site. The result was that much of the solid waste was exposed, contributing to the noisome odors in the area and creating an environment highly conducive to rodents and insects. Because of the erosion, portions of the waste mass would fall into the creek and be carried downstream, exacerbating the already existing problems and adding garbage to the brown pools of leachate.

Plaintiffs all occupy land located within several hundred meters of the landfill. The creek which flows from the landfill site to the La Plata reservoir runs by or through three tracts of land: an 11.15 *cuerda*[1] estate owned by Feliciano Baez which contains three separate residences; a 3.197 *cuerda* tract owned by Felix Diaz which included one residence and one shop; and a 6.763 *cuerda* estate owned by Jose Ortega Cabrera which contains three residences and a commercial store. The fourth tract, which is also owned by Jose Ortega Cabrera and which contains two residences and a commercial store, comprises seven *cuerdas*, is located adjacent to the dump, but is above the dump in the ravine. It appears that all four tracts are used for limited agricultural as well as residential and, in three of the tracts, commercial purposes.

The properties that have been most directly affected by the operation of the dump are those parcels adjacent to the creek that runs to the La Plata river. Prior to the establishment of the landfill, this creek had enriched plaintiffs' lives in a number of ways. Its water had been determined to be safe for drinking, so plaintiffs' families drilled wells next to it and received all their water from these wells. They also permitted their animals to drink from it. Equally significantly, the creek was used for recreation. For some fifty years, the plaintiffs had swum, boated, and fished in it. The opening of the dump, of course, ended all that. The toxic substances in the water preclude its use for any domestic purposes—indeed, the farm animals that drank from it died. The brown, toxic leachate and garbage not only make it impossible to use the creek for recreational purposes, but also have converted the creek into a source of stench and into a health risk. There is a suggestion in the record that the pollution of the creek has created a situation in which it is imperative that the plaintiffs install fences to prevent animals or children from approaching the creek.

The parcel that is not adjacent to the creek has been affected as well. Quite apart from the pollution of the creek, the

---

1. A "*cuerda*" is equal to .97 acres.

dump, in its present condition, has made the immediate surrounding area a far less pleasant place to live. The exposed garbage emits odors and attracts rodents and insects, creating a nearby health hazard.

There is very specific evidence concerning the extent to which each parcel had been damaged. A real estate appraiser testified and fixed the total damage to the four parcels at approximately $191,000, the diminution in value ranging from approximately 55 percent to approximately 30 percent per parcel. The lion's share of the loss of value —$116,828—resulted from the fact that, in the appraiser's view, the presence of the dump in the area made the land unsuitable for what had heretofore been its highest and best use: a residential subdivision. Although this was deemed the optimal use for the land, it is notable that the area had never been zoned to restrict any uses inconsistent with the establishment of such a subdivision and that there was no evidence that such subdivisions were likely to be established anywhere in the area in the foreseeable future. The most significant feature of the appraiser's report is that it states that, notwithstanding all the problems arising from the presence of the dump, the land remains suitable for residential and limited agricultural purposes.

## II.

The procedural history of this case is tangled, but an understanding of it is necessary for an appreciation of the issues before us on appeal. Before the dump opened in January, 1972, plaintiffs had realized the possible adverse effects of its operation. They then instituted an action in the Puerto Rico Superior Court to enjoin its opening on the ground that a nuisance would result. The Superior Court dismissed the suit, holding that it lacked the authority to issue an injunction unless the municipal action had first been held unconstitutional and invalid in a final and unreviewable judgment. The Supreme Court of Puerto Rico elected to review this decision, and in September, 1973, it reversed, essentially holding that plaintiffs would be entitled to injunctive relief if they proved the existence of the nuisance they alleged in their complaint. *Ortega Cabrera v. Superior Court,* —— P.R.R. —— (1973).

Shortly after the dump opened and following the Superior Court's dismissal of plaintiffs' Commonwealth court action, plaintiffs instituted the present action under 42 U.S.C. § 1983, seeking relief against the city and its mayor, Guillermo Campos. The action against the City was dismissed, and Manuel Aponte Borrero was added as a party defendant when he succeeded Campos as mayor. The gravamen of plaintiffs' federal claim is that the operation of the dump violated their federal constitutional rights both by taking their property without just compensation in violation of the Fifth Amendment and by arbitrarily and discriminatorily interfering with their property rights. They also sought relief on several local law theories.

The district court considered their claim for injunctive relief first, holding a series of hearings addressed to that issue in the spring and summer of 1972. Having decided, correctly in our view, that the federal claims possessed sufficient substance to permit the exercise of pendent jurisdiction, *see UMW v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966),[2] the district court elected to exercise such jurisdiction over the local law claims, and it considered these first. It held that the dump was a nuisance under local law, that the mayor had violated Puerto Rico's Public Policy Environmental Act, and that the operation of the dump violated a Commonwealth regulation concerning water purity. Each violation, the district court believed, was a sufficient ground for the issuance of an injunction to prevent the continuation of the harm to the plaintiffs.

Fashioning equitable relief, however, proved to be difficult. The district court

---

**2.** Whether or not plaintiffs' claim that *all* their property has been taken is sufficiently substantial to support pendent jurisdiction, the claim that the city has taken the portion that contains the polluted creek is assuredly that substantial. *See infra.*

thought the broad relief plaintiffs requested—ordering either that the entire landfill be relocated or that the city condemn all plaintiffs' lands—was inappropriate. Although the court confessed not to know what steps could feasibly be taken, it was convinced that construction work could be done at the dump to eliminate the evil and make the landfill "work correctly", and, on January 31, 1974, it ordered defendants to perform the "necessary remedial construction" work and to report to the court within ninety days. Although defendants did not then make and have not since made any proper attempt to challenge this order or to stay its effectiveness, defendants proceeded to ignore it. Plaintiffs thereafter moved that a committee of experts be appointed to "supply the court with a plan to comply with the [January 31, 1974] order." Following a hearing on this and other motions, the parties stipulated that such a committee would be appointed and would report back to the court. In June, 1975, the committee's report was filed. It recommended major construction at the landfill site which would eliminate the problem of exposed garbage and erosion, drastically reduce the amount of water flowing through the solid waste in the landfill, and eliminate many of the harmful contaminants and odor causing substances from the water flowing into the creek. So far as we know, no steps have been taken to implement this plan. Defendants have apparently not undertaken to do the construction work, and plaintiffs have not attempted to force the city to comply with the plan's terms. We note that it does not appear in this record whether this plan constitutes an authoritative interpretation of defendants' obligations under the January 31, 1974 injunction. So far as we know, therefore, the district court might, if and when the matter is placed before it, require the defendants to do either more than this plan requires to correct the situation, or less.

In August, 1976, the district court conducted a four-day trial on the issue of damages, the case going to the jury only on the issue whether plaintiffs had a right to damages under 42 U.S.C. § 1983. The jury returned with verdicts for the plaintiffs totalling $438,000. The district court, however, entered a judgment notwithstanding the verdict, holding that, as a matter of law, the individual defendants had not acted in bad faith and were immune from damages. *See Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

### III.

The issues before us concerning the injunctive relief are narrow. Because defendants have not sought appellate review of the January 31, 1974 order, they are bound by it and by future orders implementing it.[3] The sole question before us is

3. Defendants have at no time filed a notice of appeal from any aspect of the district court's judgment. Although we learn from their appellate brief that they would like to challenge portions of the judgment, it is elementary that their failure to file a notice of appeal precludes them from doing so. *See Spound v. Mohasco Industries, Inc.*, 534 F.2d 404, 410–11 (1st Cir. 1976).

One issue defendants attempt to raise does require discussion. They now argue, for the first time in this case, that the district court should have abstained under the doctrine of *Railroad Comm'n of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). We recognize that there is authority suggesting that questions of abstention may be considered sua sponte on appeal, *see Bellotti v. Baird*, 428 U.S. 132, 143 n. 10, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976), but we think it would be singularly inappropriate to order abstention now. Plaintiffs instituted this action over five and one half years ago, and it is three and a half years since they obtained the injunctive relief to which defendants now object. To permit defendants to raise a matter which would delay for several additional years plaintiffs' ability to secure injunctive relief would seem contrary to the equitable moorings of the *Pullman* doctrine. *Compare Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 329, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964).

More significantly, it strikes us as doubtful that this case presents the kind of unsettled question of state law that would require *Pullman* abstention. Insofar as the issues now before us are concerned, local law seems rather clear. *Ortega Cabrera v. Superior Court, supra*, appears to have settled the question of plaintiffs' entitlement to injunctive relief under local nuisance law, and it strikes us as equally certain that neither Puerto Rico's Public Policy Environmental Act nor the local water quality

that raised by plaintiffs: whether the district court was obliged to enter the broader injunctive relief that plaintiffs requested. We note first that the January 31, 1974 injunction, when implemented, promises both to improve the situation at the dump site and to reduce the pollution of the creek that runs through three of the tracts of land. The precise extent to which the situation will improve is unknown since defendants have not complied with the order and plaintiffs have not sought its enforcement.

■ The questions before us are whether the district court was obliged to grant plaintiffs' prayer to order defendants either to relocate the landfill or to condemn the four tracts of land plaintiffs occupy. It might seem awkward to consider these contentions now, when the precise scope of the January 31, 1974 order is unclear. But the awkwardness is perhaps more apparent than real. The relief plaintiffs desire is indisputably broader than that which will result from the implementation of the January 31, 1974 order. Since the district court emphatically rejected plaintiffs' prayers for the broad relief, the issue is now ripe for decision—indeed, the district court's rejection of these theories may have been appealable under 28 U.S.C. § 1292(a)(1) after the January 31, 1974 order. See Spangler v. United States, 415 F.2d 1242 (9th Cir. 1969); 9 Moore's Federal Practice 110.20(1) at p. 237.[4] And the district court now having finally disposed of all issues before it, the matter, in any case, is before us under 28 U.S.C. § 1291. The fact that future proceedings may be held which might clarify defendants' obligations under the January 31, 1974 order does not destroy the finality of the judgment. Such further proceedings, of course, are always possible when injunctive relief has been entered.

■ We have little difficulty deciding that the district court acted well within its discretion in declining to order that the entire landfill be relocated. The reason the district court gave for refusing to enter this relief was that it believed that "removing hundreds of thousands of tons of decayed matter and moving it through the public highways . . . would be a risky, if not altogether impossible maneuver that would endanger the public health of a whole community" and thought it manifestly unsound to remedy the health hazard created by the dump in such a way that a greater health hazard would arise. The district court's findings regarding the feasibility and dangers of plaintiffs' proposed remedy are supportable, and plaintiffs do not contest them on appeal. This would seem to be the short answer to plaintiffs' present contention, for it is elementary that a court sitting in equity has the discretion—and indeed duty—to weigh the public interest in fashioning equitable relief. See generally, F. Lawrence, Equity Jurisprudence §§ 47, 48 (1929).

But we need not rest our decision on this ground alone. The January 31, 1974 injunction was entered to remedy three specific local law violations. Since defendants have not appealed, we assume that the injunctive relief entered is an appropriate means of correcting these violations. But there is nothing in any of these provisions indicating that broader relief was required. Local nuisance law permits the sort of flexible remedy the district court devised. See, e. g., Arcelay v. Sanches, 77 P.R.R. 782, 800–04 (P.R.1955). While Puerto Rico's sanitary regulation Number 129 prohibits the pollution of surface waters by municipal governments, nothing therein suggests that the remedy for any such violation should be the dismantling of the municipal operation that

regulation requires the broader relief plaintiffs requested. We, however, recognize the possibility that unsettled issues of local law could arise in the course of future proceedings to enforce the January 31, 1974 injunction. If that should come to pass and the district court should believe that the interest in a definitive interpretation outweighs the cost of additional delay, it should utilize the relatively speedy procedure of certifying the local law question to the Puerto Rico Supreme Court.

4. Since we, perhaps erroneously, dismissed plaintiffs' attempt to appeal from the January 31, 1974 order, they, obviously, are not to be faulted for our failure to review this matter earlier.

caused the pollution and not—as the district court required—construction that would eliminate or significantly reduce the pollution.

The only local law provision which arguably requires the broad relief plaintiffs desired is Puerto Rico's Public Policy Environmental Act (PPEA). Both plaintiffs and the district court noted that the local law is modeled on the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–47, and plaintiffs rely upon federal cases interpreting NEPA in support of their claim. The federal cases, however, go against the plaintiffs. This court recently held that NEPA, absent bad faith, does not authorize any relief after a project has been completed, much less the dismantling of the entire project. *Ogunquit Village Corp. v. Davis*, 553 F.2d 243 (1st Cir. 1977). While our circuit was the first to consider the question, many other decisions supported our general approach. *See id.* at 245 and cases cited. While PPEA may well be interpreted differently from the federal act, we see nothing therein that suggests that post-completion relief should take the form of an order that the project be undone rather than one requiring the responsible officials to take feasible steps to minimize the adverse environmental consequences.

 Plaintiffs' alternative prayer—that the district court order defendants to institute eminent domain proceedings in local court and condemn all four parcels—causes us more difficulty. While such relief would be patently improper means of remedying the local law violations, it is arguable that such an order would be proper if the effect of the operation of the dump was to "take" all of the plaintiffs' property within the meaning of the Fifth Amendment.[5] We now will consider that issue.

The Fifth Amendment, of course, prohibits governmental bodies from taking private property for a public use without providing just compensation. While the taking clause's perhaps central purpose was to bar governmental bodies from using and occupying private property without paying for the privilege, the clause has been interpreted as preventing other types of governmental interference with private property. *See Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). Although the Court has not provided, and perhaps cannot provide a precise, comprehensive statement defining when interference with private property constitutes a taking, the decisions it has issued in the past half century persuade us that plaintiffs' broad assertion that all their property has been taken is without merit.

The case at bar presents a classic situation. The Bayamon city dump, notwithstanding the problems arising from its operation, is a public works project which bestows a considerable benefit on the entire community, dumps being necessary to dispose of garbage. Although plaintiffs would happily have done without it, they benefit from it as well since, we presume, their garbage is disposed there. While the benefit from a municipal project is common to all, it is obvious that, here, the burdens incident to its operations fall more heavily on plaintiffs than on the rest of the community. The question is whether the burdens placed on the four tracts of land occupied by plaintiffs should be deemed public burdens which, in all fairness and justice, should be borne by the public as a whole. *YMCA v. United States*, 395 U.S. 85, 89, 89 S.Ct. 1511, 1514, 23 L.Ed.2d 117 (1969), quoting *Armstrong v. United States, supra*, 364 U.S. at 49, 80 S.Ct. 1563.

---

**5.** If a taking were found to exist, a second possible remedy would be an order requiring the municipality to pay the claimant the value of the property taken. The Eleventh Amendment would not bar a federal court from entering such an order, *see County of Lincoln v. Luning*, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890), and it is arguable that such a remedy would be proper, notwithstanding the federal policy against having federal courts impose monetary liability on municipalities for violations of federal constitutional rights. *See Kostka v. Hogg*, 560 F.2d 37 at 44 (1st Cir. 1977) and cases cited. Because plaintiffs' claim that the entire parcels have been taken is ill-founded, we need not here consider whether either remedy would be a proper one.

Plaintiffs' argument that it should is based entirely upon the fact that, in the view of their expert, the four tracts had lost some $191,119 in value because of the presence and operation of the dump.[6] This loss of value, which is a consequence of the bad odors and proximity of the land to a health hazard, represents a diminution in value of approximately 53 percent, 41 percent, 34 percent, and 29 percent for the four parcels. Notably, some $116,000 of the decline results from the unsuitability of the land for a subdivision. Although the implementation of the January 31, 1974 injunctive order would, we think, improve the situation, the appraiser testified that nothing could be done to the landfill which would substantially affect his judgment as to the economic losses plaintiffs had suffered. Presumably this is because the enforcement of the January 31 order could not return the area to a state in which it would be desirable for a subdivision.

We note that a long line of Supreme Court cases appears to establish that the facts of substantial economic loss and significant diminution in value alone do not establish compensable takings. Government hardly could go on if it could not execute programs that adversely affect property values without paying for every such change, see *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 67 L.Ed. 322 (1922), and the Court has held, in a wide variety of settings, that governmental actions destroying recognized economic interests did not constitute takings. *See United States v. Central Eureka Mining Co.*, 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958) (government order to close all gold mines to eliminate competition); *United States v. Willow River Power Co.*, 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945) (valuable riparian land adjacent to navigable river and below high water mark flooded); *Miller v. Schoene*, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (ornamental red cedar trees on claimant's land cut down); *Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (legislative prohibition destroying 90 percent of value of property); *Consolidated Rock Products Co. v. Los Angeles*, 57 Cal.2d 515, 20 Cal.Rptr. 638, 370 P.2d 342, *appeal dismissed for want of substantial federal question*, 371 U.S. 36, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962) (zoning ordinance destroying value of land). Although there is language in several Supreme Court decisions to the effect that the extent of the diminution of value is relevant, *see Goldblatt v. Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), the fact of economic loss alone does not add up to a taking. But insofar as diminution in value is a relevant constitutional consideration, several Supreme Court decisions suggest that the focus is on the effect of the government action on the present uses of the land, the frustration of speculative economic expectations—such as plaintiffs' expectation to sell the four tracts to individuals contemplating its development as a subdivision—not being compensable. *See United States v. Grand River Dam Auth.*, 363 U.S. 229, 236, 80 S.Ct. 1134, 4 L.Ed.2d 1186 (1960); *Omnia Commercial Co. v. United States*, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923).

The recent cases in which takings have been found suggest that it may be that takings exist only when the diminution in values amounts to the total destruction of the value of an identifiable thing which is, or would have been, perceived by a reasonable owner as the subject of a distinct investment. *See Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (government action that resulted in the destruction of all value in a claimant's lien held to be a taking); *United States v. Virginia Electric & Power Co.*, 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961) (destruction of flowage easement in riparian lands held a taking, notwithstanding the fact that *United States v. Twin City Power Co.*, 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956) held that owner of riparian land's interest

---

**6.** Although this evidence was presented during the damages phase of the district court proceedings, we will consider it since it supports our, and apparently the district court's view that the four parcels have not been taken in their entireties.

in flow of navigable waters is not compensable); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (destruction of value of right to coal beneath land held a taking).[7]

The only exception to this pattern is *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), where the fact that the low flying planes had not completely destroyed the enjoyment and use of the land did not prevent the Court from finding a taking. *See id.* at 262 & n. 7, 66 S.Ct. 1062. The Court strongly hinted that it was able to reach this result in the absence of a finding of near complete destruction only because it was able to characterize the government interference as "use" of the claimant's property. *Id.* at 262 n. 7, 66 S.Ct. 1062. But the Court was careful to note that the overflights had resulted in the complete destruction of the present commercial use of the property as a chicken farm, *id.* at 259, 66 S.Ct. 1062, and it indicated that, in the absence of such interference, no taking could be found. *Id.* at 262, 66 S.Ct. 1062.[8]

 Although these cases are suggestive of a test to be applied to evaluate taking claims like the one made in the case at bar, we may dispose of the case at bar without exploring all their ramifications. Whatever else can be said about the law of takings, government action which interferes with the value of land only by making it less desirable for its present uses does not effect a taking, notwithstanding the fact that speculative future business opportunities may have been destroyed. Since plaintiffs' four tracts of land indisputably remain suitable for the uses to which they had been put prior to the establishment of the dump, the bad smells and health hazard created by the dump have not impaired the use of the land sufficiently to effect a taking. *See also* Nichols on Eminent Domain § 6.31[1].

 Although plaintiffs have not specifically advanced this argument on appeal, we note that the plaintiffs inhabiting the land next to the creek have a very plausible claim that there has been a partial taking of their property. There is a suggestion in the record, as we have noted, that the pollution of the creek with highly toxic substances has not only prevented any continuation of the recreational and other present uses of the land that includes and is immediately adjacent to the creek, but also has converted it into such a danger to health that the plaintiffs must fence off the area to prevent any use whatsoever of that land. If that pollution of the creek has had this effect, it would seem plaintiffs have a strong argument that the government action destroyed the value of this portion of the land to the same extent as if the city had regularly flooded it, *see United States v. Cress*, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917); *Barnes v. United States*, 538 F.2d 865 (Ct.Cl.1976) and cases cited, or deposited sewage upon it. *See* 2 Nichols on Eminent Domain § 6.23[2] and cases cited in n. 7. If such a partial taking were found, the measure of just compensation would be the pre-January, 1972, value of the property to the plaintiffs. *See United States v. Causby, supra.*

 While the district court noted this partial taking claim, it never made a specific determination concerning it. We think that plaintiffs have taken sufficient steps to raise a partial taking claim, but we think consideration of it now is premature. It is fundamental that a court is ill-advised to consider a substantive constitutional claim, particularly when it might rise troublesome remedial issues, *see* n. 5 *supra*, if it is the case that the enforcement of a state law claim that the plaintiff had raised

---

7. If this were the test, rejecting plaintiffs' claim that the entire four tracts had been taken would be an easy matter. Plaintiffs would lose because the identifiable thing they claim has been taken—their entire fee simple estates—retains some value.

8. In *Causby*, the Court concluded that the government had taken an easement, not the entire fee. Although the question here is whether the government has taken the entire fee, we can safely rely on *Causby* as laying down the minimum requirements for finding a taking here.

might moot the federal constitutional issue. *See Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Siler v. Louisville & Nashville R. Co.*, 213 U.S. 175, 191, 29 S.Ct. 451, 53 L.Ed. 753 (1909). Here, we do not yet know precisely what protections local law will afford plaintiffs because the January 31, 1974 decree has neither been implemented nor definitely interpreted, at least so far as we know from the record. If and when steps are taken to enforce it, the district court will have to decide precisely what must be done to reduce the amount of pollution in the creek. Since it is possible for the district court, consistent with the January 31, 1974 decree, to require a reduction in the level of the pollution that will moot the partial taking claim which the inhabitants of three of the tracts can make, it would be unwise for us to attempt to resolve this issue now. We note, moreover, that, if local law turns out not to moot this constitutional issue, we will have the benefit of the focused consideration of the district court before facing the issue.

## IV.

■■■ The final issue in this appeal arises from the district court's having set aside the jury verdicts awarding the plaintiffs some $438,000 in damages. The theory upon which the plaintiffs sought to recover damages is unclear, but it appears to have been based entirely on the fact that the January 31 decision of the district court had determined that local law was violated by the establishment and operation of the landfill. This decision, in plaintiffs' view, essentially established the individual defendants' responsibility for economic losses: the former mayor, Guillermo Campos, being liable for having unlawfully established a dump that caused plaintiffs damage, and the present mayor, Manuel Aponte Borrero, being liable for having failed to take positive steps to prevent the continuation of the harm.[9] Although plaintiffs' damages claim seems to be rooted entirely in state law, the district court instructed the jury only under 42 U.S.C. § 1983, which of course authorizes a damages recovery only if a violation of federal law occurred.[10] Both the district court below and the plaintiffs on appeal appear to have taken the position that a federal constitutional violation follows necessarily from the fact that the individual defendants authorized municipal actions that were contrary to state law. Such a position is, quite simply, wrong. The illegality of official conduct under local law "can neither add to nor subtract from its constitutional validity". *Snowden v. Hughes*, 321 U.S. 1, 11, 64 S.Ct. 397, 402, 88 L.Ed. 497 (1944). A violation of a federal constitutional provision must be shown.

Plaintiffs having shown no interference with a constitutionally protected interest,[11]

9. Although plaintiffs urge that the January 31, 1974 decision held that plaintiffs were entitled to damages, the amount of which would be determined after a second hearing, this contention is without merit. Nothing in the procedural history of the case even remotely suggests that the district court did, or lawfully could, determine on January 31, 1974 that defendants were liable in damages.

 Alternatively, plaintiffs maintain that the defendants waived their "defense" of good faith by not pleading it and that the district court erred in setting aside the verdict on the ground that bad faith had not been shown. Although we affirm the district court on the different, but in this context related, ground that no constitutional violation was shown, we note that, in this circuit, the rule is a plaintiff must plead and prove bad faith in a § 1983 suit for damages. *See Gaffney v. Silk*, 488 F.2d 1248, 1250–51 (1st Cir. 1973).

10. The plaintiffs objected to the district court's failure to give an instruction under local nuisance law. While the objection saved plaintiffs' rights, they have not argued on appeal that the failure to give this instruction was reversible error, and we treat them as having waived any such claim. We note, however, that it strikes us unlikely that a municipal official should be personally liable in damages for a nuisance operated by the city.

11. The taking issue played no role in the trial on damages, the plaintiffs apparently confining themselves to the bases of liability the court relied upon in granting an injunction. We note, however, that even if a taking had occurred, we think it doubtful that, as plaintiffs suggest, a proper remedy therefor would have been to require the individual defendants personally to pay plaintiffs "just compensation".

the only possible basis upon which recovery could occur under § 1983 against the individual defendants would be on a theory that the municipal official's violations of state law amounted to intentional and purposeful discrimination constituting a denial of equal protection of the laws. *See id.* at p. 96; *see also Cordeco Dev. Corp. v. Santiago Vasquez*, 539 F.2d 256, 260 (1st Cir. 1976); *Harrison v. Brooks*, 446 F.2d 404 (1st Cir. 1971); *McGuire v. Sadler*, 337 F.2d 902 (5th Cir. 1964); *Everlasting Dev. Corp. v. Luis Descartes*, 192 F.2d 1 (1st Cir. 1951). We need not here decide whether cases like the one at bar could ever be appropriate ones for the invocation of such a theory. Here there has been no showing of the kind of purposeful, malicious action which is a prerequisite to any such damages recovery. There is no evidence that defendants harbored any ill will towards plaintiffs, either as individuals or as members of any class of persons, much less that defendants acted with the specific intent of harming them. *Compare Cordeco Dev. Corp. v. Santiago Vasquez, supra* at 260; *see also Scheuer v. Rhodes*, 416 U.S. 232, 247–48, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

Although the district court's interpretation of § 1983 was erroneous, it set aside the jury verdict because it concluded that the defendants had acted within the scope of their official immunity. For the reasons we have stated, the district court's ultimate conclusion that the individual defendants were not liable in damages was correct.

\* \* \*

Although we reject each of the broad arguments plaintiffs have emphasized on appeal, we have not considered one argument which has been raised in this case: whether a partial taking has occurred. Because this issue cannot be considered until the district court has, if it has not already, determined defendants' duties under the January 31, 1974 decree, we must remand the case for a determination of defendants' responsibilities under the decree, and, if necessary, for consideration of the partial taking claim.

 In addition, of course, if defendants continue to take no action to comply with the decree, the court may consider the appropriateness of imposing contempt penalties to compel compliance, including the use of fines. *See United States v. United Mine Workers*, 330 U.S. 258, 302–07, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *International Business Machines v. United States*, 493 F.2d 112 (2d Cir. 1973), *cert. denied*, 416 U.S. 976, 94 S.Ct. 2378, 40 L.Ed.2d 756 (1974); *cf. Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

*So ordered.*